[No. B057311. Second Dist., Div. Five. Feb. 6, 1992.]

STUART FLAIT, Plaintiff and Appellant, v.
NORTH AMERICAN WATCH CORPORATION, Defendant and
Respondent.

470

**COUNSEL**

Herbert B. Richmond for Plaintiff and Appellant.

Bryan, Cave, McPheeters & McRoberts and Bonita L. Churney for Defendant and Respondent.

## OPINION

**BOREN, J.**—Stuart Flait claims his former employer wrongfully terminated his employment in violation of the California Fair Employment and Housing Act (CFEHA). (Gov. Code, § 12900 et seq.) There are triable issues concerning whether Flait was terminated in retaliation for putting a stop to his supervisor's sexual harassment of a coworker. Accordingly, we reverse the trial court's summary adjudication, its entry of a final judgment, and its award of attorney fees and costs to the employer.

## FACTS

Appellant Flait went to work as a sales representative for respondent North American Watch Corporation (NAWC) on February 1, 1984. Flait's employment agreement states that "it is not a contract of employment for a definite period."

Flait increased NAWC's sales within his territory. In 1987, for example, his sales increased by 58 percent over the previous year. NAWC does not deny that Flait increased its sales volume. Nevertheless, it became dissatisfied with Flait's performance, purportedly because he exhibited greater allegiance to his customers than to his employer, did not require customers to carry all segments of NAWC's line, and did not adequately service some stores. NAWC's president, James Reilly, its vice-president of human resources, Anthony Ruggiero, and Flait's supervisor, John Pistner, spoke to Flait about what they termed an "attitude problem" in 1986 and 1987, and he agreed to improve. Flait observes that NAWC controls the makeup of the line carried by customers because all customer orders must be approved and accepted by the company, a fact conceded by NAWC.

Flait supervised a NAWC marketing representative named Pamela Berger. Berger called Flait in March of 1987, and complained that a few days earlier, during a sales meeting, Pistner had called her a vulgar slang expression for female genitals in front of other employees. Flait, in turn, spoke to Pistner and told him it was improper to speak to a female employee in that manner. Pistner did not confront the issue and hung up the telephone. Subsequently, in March or April of 1987, Berger reported to Flait that Pistner had made comments to her on at least one occasion regarding his oral sex habits. Flait called Pistner and reiterated his belief that it was inappropriate for Pistner, a

senior vice-president, to make sexual comments to Berger and that this had to stop. Pistner responded by saying, "Next subject. Next subject." Flait also recalled that Berger subsequently informed him that Pistner had telephoned her and asked, in crude terms, whether she had had sexual relations the previous evening. Once again, in August of 1987, Flait called Pistner and told him to cease bothering Berger. Pistner said good-bye and hung up the telephone. Flait subsequently noticed that Pistner "turned against him" despite Flait's business success, and was confrontational with him in front of Reilly.

Although Berger never used the precise term "sexual harassment," Flait was convinced that Berger felt harassed because she reported the incidents with Pistner to him time and again. Her complaints indicated to him that Pistner's behavior bothered her. He felt the problem was creating a hostile work environment for Berger because she told him it displeased her and was improper, and it caused her to lose respect for her superiors. Flait thought he was responsible for taking care of Berger's dissatisfaction because he was her supervisor and she had reported the incidents to him directly. NAWC does not have any established policy or guidelines under which complaints of employee harassment or discrimination may be addressed.

In early January of 1988, Flait was summoned to NAWC's main office. He believed he was going to be promoted because Pistner had told him there was a possibility he would be made a regional manager, because he had opened many new accounts and increased sales, helped train new salesmen, and never received letters of criticism. Instead, his employment was terminated because he was not a "company man." Pistner made the decision to terminate Flait's employment, telling Reilly it was because he was "continually" dissatisfied with Flait's performance. Reilly could not, however, recall any instances of dissatisfaction with Flait that he discussed with Pistner. Pistner never voiced any criticisms of Flait to John Curliss, Pistner's assistant sales manager and the person to whom Flait reported, prior to making his decision to terminate, nor could Pistner recall reviewing Flait's sales record before firing him. According to Reilly, Pistner and Ruggiero, Flait was terminated because of his attitude toward company policy. Flait revealed to Reilly his belief that he was being terminated as punishment for protesting Pistner's abuse of Berger. Reilly was taken aback to learn of Pistner's offensive behavior, but after Pistner denied making the statements to Berger, Reilly did not look any further into the matter.

Flait did not remember speaking to anyone at NAWC other than Pistner about Pistner's comments to Berger, believing that the matter could be resolved between the two of them without it going any further. However,

Curliss recalled that in 1987, Flait told him he had confronted Pistner and told him not to say obscene things to Berger. Curliss was not surprised because he knew Pistner engaged in this type of behavior.

Shortly after Flait was terminated, Berger handwrote a statement regarding Pistner's behavior at Flait's request. She stated that Pistner had expressed the vulgar epithet and comments to her, that she reported these incidents to Flait, and that she resigned from NAWC in January of 1988 because she was unable to tolerate the harassment. At her deposition during the course of this lawsuit, taken pursuant to subpoena, Berger acknowledged that the handwritten statement was "accurate, true and correct," and that it was made of her own free will. She confirmed the incidents with Pistner, but testified that he had apologized for calling her the sexual epithet after she confronted him, and that this was satisfactory "knowing Mr. Pistner," by which she meant that he had "a dirty mouth." Though offended, she tried not to take the remarks personally because she heard this was common behavior for Pistner, who made similar comments to other employees.

Berger agreed that she complained about Pistner's comments to Flait, to whom she spoke only briefly once a month. She did not tell Flait she felt the matter had been resolved because she was not sure what else would happen in the future. Berger testified that Pistner's comments "made me not respect my bosses too much, and it's hard to do a good job for a company when you don't respect them." They did not, however, affect her job performance, in her opinion, nor did she feel they created a hostile work environment. Contrary to her written statement, Berger stated in her deposition that she did not feel harassed by Pistner, nor was his conduct the reason she quit her job. Rather, she quit because she felt "harassed" by NAWC's demands that she travel constantly as part of her job, which she felt unable to do after being injured in a car accident.

Berger was upset when she received the subpoena to testify, and called Flait to say that she had just started a new job and did not want to be involved because she feared tarnishing her reputation and losing her job if it was discovered that she was cooperating in Flait's lawsuit against NAWC. Moreover, her parents worked in the watch industry and had expressly forbidden her from participating in Flait's lawsuit. Berger admitted in her deposition that she was angry at being involved in Flait's lawsuit. She also testified that although her handwritten statement following Flait's termination was true and correct, she wanted to "retract everything." When pressed further, however, she testified that there was only one minor change she would make to her handwritten statement (changing the word "occasions" to "occasion"); otherwise there was nothing she would add to it, modify, or delete.

Following his termination, Flait filed a complaint with the Department of Fair Employment and Housing, and allegedly received a "right to sue" letter from the department on March 27, 1988. He then filed this lawsuit against NAWC in April of 1988, alleging that he was discharged in retaliation for his efforts to prevent Berger from being sexually harassed. In December of 1990, NAWC filed its motion for summary adjudication of issues. In January of 1991, the trial court summarily adjudicated the following issues: (1) Berger was not sexually harassed and Flait could not have reasonably believed she had been harassed; (2) Flait was terminated for good cause and not for engaging in statutorily protected behavior; (3) Flait's claim of breach of the covenant of good faith and fair dealing was either statutorily preempted, or, alternatively, it was barred because he was an at-will employee; (4) Flait's demand for an accounting had already been satisfied; and (5) Flait's claim for emotional distress was preempted by the workers' compensation act.

In February of 1991, NAWC filed a motion seeking entry of judgment and an award of attorney's fees and costs, which Flait opposed. The trial court entered judgment for NAWC on March 4, 1991, and awarded NAWC attorney's fees and costs of $153,957.61. This appeal was taken one month later.

## DISCUSSION

### 1. *Standard of Review*

In reviewing a summary judgment, we must determine if "all the papers submitted show that there is no triable issue as to any material fact and the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) ■ " 'The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory.' [Citation.] 'The affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion.' [Citation.] '. . . [I]ssue finding rather than issue determination is the pivot upon which the summary judgment law turns.' [Citation.]" (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762, 694 P.2d 1134].)

■ "A defendant moving for summary judgment must conclusively negate a necessary element of the plaintiff's case or establish a complete defense and thereby demonstrate that under no hypothesis is there a material factual issue which requires the process of a trial." (*Saatzer* v. *Smith* (1981)

122 Cal.App.3d 512, 517 [176 Cal.Rptr. 68].) An appellate court must make its own independent determination of the construction and effect of the papers submitted. (*Preis* v. *American Indemnity Co.* (1990) 220 Cal.App.3d 752, 757 [269 Cal.Rptr. 617].)

## 2. *Government Code Section 12940*

Government Code section 12940, subdivision (h) prohibits sexual and other types of harassment in the workplace. It requires that an employing entity, its agents or supervisors, who know or should have known of harassing conduct "take immediate and appropriate corrective action." The employing entity must take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits is not necessary in order to establish harassment.

In addition, subdivision (f) of Government Code section 12940 makes it an unlawful employment practice for an employer "*to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part . . . .*" (Italics added.)

The legislative note to Government Code section 12940 states, "The Legislature finds and declares that it is the existing policy of the State of California to prohibit harassment and discrimination in employment on the basis of any protected classification. Such conduct whether intentional or unintentional is a violation of the civil rights of California citizenry and has been shown to decrease productivity in the workforce. It is the existing policy of the State of California, as declared by the Legislature, that procedures be established by which allegations of prohibited harassment and discrimination may be filed, timely and efficiently investigated, and fairly adjudicated, and that agencies and employers be required to establish affirmative programs which include prompt and remedial internal procedures and monitoring so that worksites will be maintained free from prohibited harassment and discrimination by their agents, administrators, and supervisors as well as by their nonsupervisors and clientele. To further this intent, the Legislature enacts this act." (Stats. 1984, ch. 1754, § 1, p. 60.)

## 3. *Application of Government Code Section 12940*

■ CFEHA prohibits an employer from terminating any employee, including at-will employees, for attempting to comply with its provisions forbidding racial, sexual or other forms of job harassment. Lawsuits claiming retaliatory employment termination in violation of CFEHA are analogous to federal "title VII" claims (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq; hereafter title VII), and are evaluated under federal

law interpreting title VII cases.[1] (*University of Southern California* v. *Superior Court* (1990) 222 Cal.App.3d 1028, 1035 [272 Cal.Rptr. 264]; *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 606 [262 Cal. Rptr. 842].)

The elements of title VII and CFEHA claims require that (1) the plaintiff establish a prima facie case of retaliation, (2) the defendant articulate a legitimate nonretaliatory explanation for its acts, and (3) the plaintiff show that the defendant's proffered explanation is merely a pretext for the illegal termination. (*Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 252-253 [67 L.Ed.2d 207, 214-215, 101 S.Ct. 1089]; *Miller* v. *Fairchild Industries, Inc.* (9th Cir. 1986) 797 F.2d 727, 731; *Valdez* v. *City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1051 [282 Cal.Rptr. 726]; *University of Southern California* v. *Superior Court, supra,* 222 Cal.App.3d at p. 1035.)

a. *Prima Facie Case*

To establish a prima facie case, the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action. (*Wrighten* v. *Metropolitan Hospitals, Inc.* (9th Cir. 1984) 726 F.2d 1346, 1354; *Fisher* v. *San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at p. 614.) The trial court in this case concluded that Flait failed to make a prima facie case of retaliatory termination, because Berger was not sexually harassed and Flait could not have reasonably believed she had been harassed.

■   Both the state and federal statutes are designed to foster open communication between an employer and its employees regarding perceived misconduct, encouraging employees to call their employers' attention to unlawful practices of which the employer might be unaware and which might result in litigation if not voluntarily changed. (*Berg* v. *La Crosse Cooler Co.* (7th Cir. 1980) 612 F.2d 1041, 1045.) CFEHA goes even further than the federal statute by *requiring* that supervisors "take immediate and appropriate corrective action" when harassment is brought to their attention. (Gov. Code, § 12940, subd. (h).) The statute then protects the supervisor who properly takes immediate corrective action from retaliation. Flait, as Berger's supervisor, therefore had a statutory duty to take immediate action to end sexual harassment, which is defined as "verbal, physical, or sexual behavior directed at an individual because of her, or his, gender," and

---

[1]Subdivision (a) of 42 U.S.C. section 2000e-3 provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ."

includes, but is not limited to, conduct which is verbal (such as epithets, derogatory comments or slurs), as well as physical and visual insults. (*Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 45, fn. 2 [276 Cal.Rptr. 114, 801 P.2d 357], citing Fair Employment and Housing Commission decisions and regulations; *Meritor Savings Bank* v. *Vinson* (1986) 477 U.S. 57, 65 [91 L.Ed.2d 49, 58-59, 106 S.Ct. 2399].)

■  An employer may not "fire an employee because he opposed discrimination against a fellow employee, even if he was mistaken and there was no discrimination. The mistake must, of course, be a sincere one; and presumably it must be reasonable . . . for it seems unlikely that the framers of Title VII would have wanted to encourage the filing of utterly baseless charges by preventing employers from disciplining the employees who made them. But it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case." (*Rucker* v. *Higher Educational Aids Bd.* (7th Cir. 1982) 669 F.2d 1179, 1182.)

■  Thus, the fundamental question posed by this case is the reasonableness of Flait's belief that he was opposing unlawful harassment. He may prevail even if the harassment was not sufficiently severe or pervasive that it altered Berger's work environment, and even if Berger had some unarticulated belief that she had not been harassed. (*Holland* v. *Jefferson Nat. Life Ins. Co.* (7th Cir. 1989) 883 F.2d 1307, 1315; *Jenkins* v. *Orkin Exterminating Co., Inc.* (E.D.Tex. 1986) 646 F.Supp. 1274, 1278.) Whether Flait's belief that Berger was being harassed was reasonable, in good faith and sincere, as he claims it was, is a credibility question that cannot be resolved by summary judgment (*Miller* v. *Fairchild Industries, Inc.* (9th Cir. 1989) 885 F.2d 498, 506) and presents a triable issue of fact. In making a determination, the fact finder will, of course, have to weigh the credibility of Berger's handwritten statement against her attempts to diminish that statement during her deposition, in light of her admitted fear and anger at being involved in Flait's lawsuit. It is entirely unsuitable to unravel Berger's tangled web of motivations on a motion for summary judgment. It is enough that she does not dispute Pistner made the statements to her and that she reported them to Flait.

NAWC's argument that Flait should have waited to take action until the harassment became pervasive, continual and systematic is antithetical to Government Code section 12940's requirement that a supervisor take *immediate and appropriate corrective action* when a harassment complaint is brought to his attention. It hardly behooves NAWC to complain that Flait did not take "appropriate" remedial action by confronting the issuer of the

remarks when the company admittedly failed to promulgate any guidelines or policy instructing its supervisors how to handle harassment claims, in violation of the Legislature's express mandate that each company operating in this state establish an affirmative antiharassment program with definite procedures and monitoring. In view of NAWC's failure to establish the legislatively mandated program, we find it was appropriate for Flait to go directly to the source of the problem in an attempt to resolve it. A jury could find that Flait was entirely successful in his "whistle-blowing" efforts because the sexual comments ceased after he confronted Pistner. (See *Meritor Savings Bank* v. *Vinson, supra,* 477 U.S. at pp. 72-73 [91 L.Ed.2d at pp. 62-63] (sexually harassed employee's failure to grieve through proper internal channels does not insulate employer from liability. The employer's procedures were not calculated to encourage victims of harassment to come forward).)

We also find there is sufficient circumstantial evidence from which a trier of fact could conclude that there is a causal link between Flait's attempt to perform his duties under Government Code section 12940 and his termination. The evidence showed that the same highly placed corporate officer who made the offending comments was also responsible for Flait's termination, which is probative of NAWC's knowledge that Flait had engaged in protected activity. The evidence also showed that Flait was terminated only a few months after he last confronted Pistner, though he had worked for the company for four years. This evidence is sufficient to withstand summary judgment on the issue of NAWC's retaliatory motives. (*Miller* v. *Fairchild Industries, Inc., supra,* 797 F.2d 727, 731-732; *Yartzoff* v. *Thomas* (9th Cir. 1987) 809 F.2d 1371, 1376; *Holland* v. *Jefferson Nat. Life Ins. Co., supra,* 883 F.2d at p. 1314 [employee laid off four or five months after complaining to her supervisor of another employee's sexually offensive remarks]; *Fisher* v. *San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at p. 615.) Flait is not required to submit direct evidence of NAWC's intent so long as improper motive can be inferred from circumstantial evidence. (*U.S. Postal Service Bd. of Govs.* v. *Aikens* (1983) 460 U.S. 711, 714, fn. 3, 717 [75 L.Ed.2d 403, 409, 411, 103 S.Ct. 1478].)

In sum, we find that Flait has established the three elements of a prima facie case under Government Code section 12940. First, the evidence indicates Flait engaged in a protected activity in that he was required by law to take immediate corrective action upon learning of a subordinate's complaints of another employee's apparent violation of CFEHA. Whether Flait was motivated by a reasonable, sincere and good faith belief that harassment had occurred is a triable issue to be determined by a trier of fact. Second, Flait was subject to adverse employment action when he was terminated. Third, there is sufficient circumstantial evidence of a causal link between the protected conduct and the termination to allow this issue also to be resolved by a fact finder.

b. *Legitimate Business Justification*

NAWC presented testimony that Flait was terminated because he was not a "company man," was too loyal to his customers, and failed to insist that his customers carry a balanced representation of the company's line.

The company's asserted business reasons are sufficient to permit a trier of fact to conclude that its employment decision may not have been motivated by animus. (*Yartzoff* v. *Thomas, supra,* 809 F.2d at p. 1376.) These reasons are not, however, sufficient to justify judgment as a matter of law if Flait presents evidence that a fact finder could find they constituted a pretext.

c. *Pretext*

The primary reason advanced by NAWC for Flait's termination was that he failed to require his customers to carry a balanced representation of the company's line of watches. NAWC concedes that it controls whether a customer carries a balanced representation of NAWC's line because it alone approves and accepts customer orders. Nevertheless, the company asserts that "Flait continually turned in purchase orders which were deficient and which NAWC was forced to reject because the purchases requested failed to follow NAWC's balanced representation policy." Apart from the fact that there is no supporting documentary or testimonial evidence showing that Flait did this "continually," there is also no explanation offered as to how Flait's sales could have increased by nearly 60 percent in the year before he was terminated if his orders were "continually" rejected. NAWC also fails to carry its burden of showing that Flait's sales were not comparable to sales made in other territories. In short, a trier of fact could find that the "balanced representation" justification was bogus, that the purportedly excessive customer allegiance was in fact the key to Flait's nearly 60 percent increase in sales for NAWC, and that by saying Flait was not a "company man," NAWC meant it wanted salesmen who did not complain about the sexual remarks directed at female employees by a company senior vice-president.

Pretext may also be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination. (*Miller* v. *Fairchild Industries, Inc., supra,* 885 F.2d 498, 505-506.)

According to company president Reilly, John Pistner, issuer of the offensive sexual remarks, was the sole person charged with the decision to terminate Flait's employment. Reilly deferred to Pistner's decision, which came only four months after Flait last confronted Pistner and told him to

stop making vulgar and suggestive remarks to Berger. No one, including Pistner, could recall looking at Flait's sales or any other records before terminating his employment, and the company does not dispute that Flait had increased sales by nearly 60 percent immediately prior to his termination. The mere fact that Flait had received a few verbal criticisms of his methods in the past, while probative of NAWC's intent, is not dispositive proof of the legitimacy of his termination. (*Jenkins* v. *Orkin Exterminating Co., Inc.,* *supra,* 646 F.Supp. at pp. 1278-1279.) The criticisms were counterbalanced by compliments regarding Flait's salesmanship. Pistner testified that at various times he told Flait he was "doing a good job," that the company was lucky to have Flait as a salesman, and that there was a possibility Flait would be promoted to the position of sales manager.

■ Viewing the evidence in the light most favorable to Flait, a reasonable trier of fact could conclude that NAWC's articulated reasons for terminating Flait's employment are not worthy of credence.

■ Finally, the trial court erred in concluding that Flait's claims of emotional distress arising from the statutory violation were barred by the workers' compensation act. The Legislature, in enacting CFEHA, did not intend that its objective of providing relief from civil rights violations would be defeated by the exclusive remedy provision of the workers' compensation act. (*Jones* v. *Los Angeles Community College Dist.* (1988) 198 Cal.App.3d 794, 807-809 [244 Cal.Rptr. 37]; *Meninga* v. *Raley's, Inc.* (1989) 216 Cal.App.3d 79, 86-91 [264 Cal.Rptr. 319].)

## 4. *Implied Covenant of Good Faith and Fair Dealing*

■ Flait seeks damages for NAWC's alleged violation of the implied covenant of good faith and fair dealing. The Supreme Court determined that tort damages could not be recovered for breach of the implied covenant in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 700 [254 Cal.Rptr. 211, 765 P.2d 373]. However, a contract cause of action for breach of the implied covenant may be stated if the plaintiff can show he was denied the benefits of the parties' agreement. (*Jenkins* v. *Family Health Program* (1989) 214 Cal.App.3d 440, 446-447 [262 Cal.Rptr. 798].) "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes." (*Foley, supra,* 47 Cal.3d at p. 690.) Contractual remedies, even for breach of the implied covenant, are not affected by the motive of the breaching party. (*Id.* at p. 699; *Summers* v. *City of Cathedral City* (1990) 225 Cal.App.3d 1047, 1059 [275 Cal.Rptr. 594].)

The contract between Flait and NAWC states that it is not for a definite term. Employment having no specified term is terminable at the will of either party. (Lab. Code, § 2922.) Flait did not present evidence of any other contract term or established company policy which assured him of continued employment, or which was violated by his termination. (*Kerr* v. *Rose* (1990) 216 Cal.App.3d 1551, 1561-1562 [265 Cal.Rptr. 597]; *Slivinsky* v. *Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 806 [270 Cal.Rptr. 585].) Because Flait cannot show that a contractual covenant or promise was violated, summary judgment was proper on his second cause of action for breach of the implied covenant of good faith and fair dealing.[2]

## 5. *Award of Fees and Costs*

The trial court awarded respondent attorney's fees and costs pursuant to Government Code section 12965, subdivision (b), and Code of Civil Procedure sections 1032 and 1033.5. That award is reversed because respondent is no longer the prevailing party on Flait's cause of action for retaliatory termination in violation of CFEHA.

### DISPOSITION

The order entering judgment in favor of respondent and awarding respondent its attorney's fees and costs is reversed. The trial court is directed to reinstate the first cause of action stated in appellant's complaint. The parties are to bear their own costs on appeal.

Ashby, Acting P. J., and Grignon, J., concurred.

A petition for a rehearing was denied March 5, 1992.

---

[2]Flait has seemingly confused the cause of action stated in his pleadings with two other theories of recovery, tortious discharge in contravention of public policy (*Foley, supra,* 47 Cal.3d at pp. 665-671) and breach of the implied-in-fact covenant not to discharge except for good cause (*Foley, supra,* 47 Cal.3d at pp. 675-682). Assuming he is able to obtain leave to amend from the trial court, Flait may be able to succeed on a public policy theory. (See *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 88-91 [276 Cal.Rptr. 130, 801 P.2d 373].) Flait does not dispute the trial court's summary adjudication of his third cause of action for an accounting; therefore we do not discuss it here.