[No. B165771. Second Dist., Div. Four. Sept. 29, 2004.]

CALIFORNIA FAIR EMPLOYMENT AND HOUSING COMMISSION, Plaintiff and Appellant, v.
GEMINI ALUMINUM CORPORATION, Defendant and Appellant.

COUNSEL

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, Suzanne M. Ambrose and Timothy M. Muscat, Deputy Attorneys General, for Plaintiff and Appellant.

Littler & Mendelson, Barrett K. Green, Brandie N. Charles and Connie L. Michaels for Defendant and Appellant.

OPINION

**HASTINGS, Acting P. J.—**

## BACKGROUND

In 1997, Lester Young filed a religious discrimination complaint with the Department of Fair Employment and Housing (the Department) against his former employer, Gemini Aluminum Corporation. The Department issued an accusation, and then a first amended accusation in January 2001.

Gemini contested the accusation, and the matter was heard by an administrative hearing officer in January and February 2001. The Commission reviewed the evidence, declined to adopt the hearing officer's decision, and issued its own decision on January 10, 2002.

The Commission found that Gemini had discriminated against Young by failing to accommodate his religious beliefs, that it had failed to prevent discrimination, and that it had retaliated against Young for protesting the discrimination, all in violation of Government Code section 12940.[1]

Gemini filed a petition for writ of administrative mandate in the Los Angeles County Superior Court to overturn the decision of the Commission.[2] The Superior Court granted the petition and issued a writ directing the Commission to vacate its decision.

The Department appeals from the judgment, and Gemini appeals from the Superior Court's denial of its request for attorney fees. In a separate motion, Gemini moved to dismiss the Department's appeal, on the ground of untimeliness. We found the appeal timely and denied the motion.

We conclude the trial court erred and we reverse.

## FACTS

We begin with a short summary of the evidence before the Commission, in the light most favorable to the Commission's findings, indulging in all reasonable inferences in support of those findings. (See *Johnson Controls, Inc. v. Fair Employment & Housing Com.* (1990) 218 Cal.App.3d 517, 530–532 [267 Cal.Rptr. 158].) We shall review the evidence and findings in greater depth in our discussion of the issues.

By mid-June 1997, Young had been employed by Gemini for approximately 15 months. Young had been a Jehovah's Witness since May 1970, and had attended a Jehovah's Witness convention every year, with the exception of one or two, since then. Attending the three-day convention is considered a form of worship and religious study in his faith.

On June 16, 1997, Young requested time off for up to two days, Friday, June 27, and Saturday, June 28, 1997, *if he was scheduled to work that Saturday.*[3] The request was made to Young's supervisor, Jack Kaufman, the person responsible for taking the request to management and who was also a member of the management committee which would grant or deny the

---

[1] All statutory references are to the Government Code, unless otherwise indicated.

[2] See Code of Civil Procedure section 1094.5.

[3] Saturday is a workday at Gemini only when posted. No one informed Young that he was supposed to work that Saturday, and it was not posted.

request. In support of his request, Young told Kaufman that he (Young) was a Jehovah's Witness and was scheduled to attend a religious convention beginning Friday, June 27, 1997. Young asked if Kaufman "would write out a notice to that effect and [Young] would sign it." Kaufman agreed to do so.

Kaufman did not have Young sign anything, but Kaufman did submit a written request to Gemini's management committee the same day. In the request Kaufman failed to include that the reason Young wanted the time off was to attend the Jehovah's Witness convention. The committee denied the request for failure to include the reason. On June 25, 1997, Kaufman submitted another written request, this time stating that the reason given was to attend a religious convention. The committee again denied the request.

The following morning, June 26th, Kaufman told Young the committee had again denied the request. Young discussed his religion with Kaufman and why he needed the days off: "We talked a little bit about my religion and why [] I was taking the days off, and I told him that it was our responsibility to be there at these conventions because in the information that we're given at our Kingdom Halls that—that they encourage us to be there on the [] three days." He told Kaufman he would be going to the convention despite the denial of his request, and he did so. As a result, he missed work on Friday, June 27, 1997.

When Young returned to work on Monday, he was called into Kaufman's office and given notice of a 10-day suspension for failing to show up for work on Friday and Saturday. Young told Kaufman that he thought the suspension was unfair because he felt obligated to go to the convention for his religion, and he knew of other people who had received lesser suspensions for more absences. A few days later, on either July 2 or 3, Young telephoned Kaufman, asked for a copy of the written request Kaufman had submitted to the committee, and he told Kaufman that he was going to the "labor board." Kaufman reported this conversation to the committee, and a few days later, Young was fired.

## DISCUSSION

We turn first to the Department's appeal, since Gemini's claim to attorney fees depends upon our affirming the judgment in its favor, which we shall reverse.[4] The Department contends that the Superior Court erred in its determination that the Commission's findings were not supported by substantial evidence. As we shall explain, we agree.

---

[4] See discussion in part 4, *post.*

### 1. *Failure to Initiate Reasonable Accommodation Efforts*

It is "an unlawful employment practice . . . [¶] [f]or an employer, because of the . . . religious creed . . . of any person, . . . to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (§ 12940, subd. (a).)

Further, it is unlawful "[f]or an employer . . . to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief *or observance* and any employment requirement, unless the employer . . . demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with his or her religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance without undue hardship on the conduct of the business of the employer or other entity covered by this part. [¶] *Religious belief or observance, as used in [section 12940], includes, but is not limited to, observance of a Sabbath or other religious holy day or days, and reasonable time necessary for travel prior and subsequent to a religious observance.*" (§ 12940, subd. (*l*), italics added.)[5]

"Further description of the scope of the religious belief protection in the [Fair Employment and Housing Act, Gov. Code, § 12900 et seq.; hereafter FEHA] is found in section 12926, subdivision (o), which states: 'As used in this part in connection with unlawful practices, unless a different meaning clearly appears from the context: [¶] . . . [¶] (o) "Religious creed," "religion," "religious observance," "religious belief," and "creed" include *all aspects* of religious belief, observance and practice.' " (*Friedman v. Southern Cal. Permanente Medical Group* (2002) 102 Cal.App.4th 39, 45 [125 Cal.Rptr.2d 663], italics added.)

 There are three elements to a prima facie case under section 12940, subdivision (*l*): the employee sincerely held a religious belief; the employer was aware of that belief; and the belief conflicted with an employment requirement. (*Friedman v. Southern Cal. Permanente Medical Group, supra,* 102 Cal.App.4th at p. 45.) Once the employee establishes a prima facie case with sufficient evidence of the three elements, the burden shifts to the employer to establish that "it initiated good faith efforts to accommodate or no accommodation was possible without producing undue hardship. [Citations.]" (*Soldinger v. Northwest Airlines, Inc.* (1996) 51 Cal.App.4th 345, 370 [58 Cal.Rptr.2d 747].)

---

[5] This provision was subdivision (j) in 1997. The statute was rewritten in 1999, and the subdivisions relevant here were renumbered. (See Stats. 1999, ch. 592.) The accusation and decision reflect the numbering as it was in 1997.

The Commission found that all three elements had been established by the evidence. "On appeal, this court exercises the same function as the trial court and must decide if the agency's findings were based on substantial evidence. Neither court may reweigh the evidence, and both courts must view the evidence in the light most favorable to the Commission's findings and indulge in all reasonable inferences in support thereof. [Citations.]" (*Johnson Controls, Inc. v. Fair Employment & Housing Com., supra,* 218 Cal.App.3d at p. 531.) Our review of the record reveals substantial evidence that Young possessed a sincerely held religious belief as a Jehovah's Witness and that his attendance at the convention fell within the scope of the FEHA as a religious observance.

Young testified that he had been a Jehovah's Witness since May 1970, that he considered attending a Jehovah's Witness convention to be a form of worship and religious study, and that he had attended almost every year since 1970. He believed that it was his responsibility to attend.

Lori Wilson, Young's daughter, testified that she was also a practicing Jehovah's Witness, and had been attending conventions yearly with her family since 1983. There are several conventions each year, and adherents to the religion are expected to attend the convention assigned to his or her congregation by the Watchtower Bible and Tract Society. Since 1983, Young has attended with Wilson, her husband, and her children every year that they have belonged to the same congregation.

Gemini argues that this evidence is insufficient to establish a bona fide religious belief. It points out that Young admitted he missed a convention one year to go on a family vacation, suggesting that his attendance was not *obligatory*. Further, it notes that while Young testified he was encouraged to attend and he felt it his responsibility to attend the conventions, he did not testify that he was *required* to attend. Gemini also references the testimony of Wilson where she testified that although each congregation was assigned to attend a particular convention and members were strongly recommended to stay with one's congregation, due to the number of rooms set aside, a member is allowed to attend a different convention. Gemini concludes from this evidence that it was Young's personal *preference*, and not a "temporal mandate" of his religion, that required his attendance at that particular convention.

Initially we must note that Gemini's argument suggests a weighing of the evidence in favor of an inference against the finding of the Commission that Young's belief in his need to attend the convention flowed from a sincerely held religious belief. This we cannot do. (*Johnson Controls, Inc. v. Fair Employment & Housing Com., supra,* 218 Cal.App.3d at p. 531.)

To the extent Gemini is arguing the evidence does not establish that attendance at the convention is either a "tenet" or "temporal mandate" of Young's religion, and is therefore insufficient to support the Commission's finding of failure to accommodate, we disagree.

■ Under California law, an employer is required to accommodate not just a religious *belief*, but also a religious *observance*, if reasonably possible without undue hardship. (§ 12940, subd. (*l*).) There is nothing in the language of the statute that obligates an employer to accommodate only those religious practices that are required by the tenets of the employee's religion, or that amount to a "temporal mandate" of the religion. Gemini has taken that expression from *Tiano v. Dillard Dept. Stores, Inc.* (9th Cir. 1998) 139 F.3d 679, 682 (*Tiano*), a case arising out of title VII of the Civil Rights Act, 42 United States Code sections 2000e et seq (Title VII). We have found no other published opinion relating to religious discrimination in which the expression "temporal mandate" appears.

In *Tiano*, the employee, a salesperson, requested time off in October to attend a pilgrimage to Medjugorje, Yugoslavia. The request was denied because the company was having a sale that month and the company had established a "no leave" policy. In connection with her discrimination claim, the employee testified that she was a devout Catholic and had a " 'calling from God' " to attend a pilgrimage to Medjugorje where it was said that the Virgin Mary appeared. (*Tiano, supra,* 139 F.3d at p. 680.) She also testified, "I felt I was called to go. . . . I felt that from deep in my heart that I was called. I had to be there *at that time*." (*Id.* at p. 682, some italics added.) The trier of fact found that the employee held a bona fide religious belief, which included a temporal mandate, that she be allowed to carry out the pilgrimage at that particular time and denial of her request resulted in religious discrimination. The Ninth Circuit pointed out there was no evidence that the Catholic Church had designated Medjugorje as an official pilgrimage site or advocated the employee's pilgrimage and the employee's testimony was not corroborated, but consisted of a "lone unilateral statement." (*Tiano, supra,* 139 F.3d at p. 682.) It further noted that she filed her complaint with the Equal Employment Opportunity Commission only after learning that her ticket was not refundable. The Ninth Circuit concluded there was insufficient evidence supporting the finding of a "temporal mandate" requiring the employee to take the pilgrimage at that *particular* time. (*Ibid.*)

*Tiano* is alone in ruling that Title VII requires proof of a "temporal mandate" under the tenets of an employee's particular religion. The relevant inquiry is the sincerity, not the verity of the employee's religious beliefs.

(*Philbrook v. Ansonia Bd. of Educ.* (2d Cir. 1985) 757 F.2d 476, affd. on other grounds (1986) 479 U.S. 60 [93 L.Ed.2d 305, 107 S.Ct. 367].) " '[T]o restrict the act to those practices which are mandated or prohibited by a tenet of the religion, would involve the court in determining not only what are the tenets of a particular religion, . . . but would frequently require the courts to decide whether a particular practice is or is not required by the tenets of the religion. . . . [S]uch a judicial determination [would] be irreconcilable with the warning issued by the Supreme Court in *Fowler v. Rhode Island* (1953) 345 U.S. 67, 70 [73 S.Ct. 526, 527, 97 L.Ed. 828], '[I]t is no business of courts to say . . . what is a religious practice or activity.' [Citations.]" (*Heller v. EBB Auto Co.* (9th Cir. 1993) 8 F.3d 1433, 1438.)[6]

Even though we do not agree that proof of a "temporal mandate" is necessary to establish religious discrimination, the evidence here does support one. Young testified that he believed that the Jehovah's Witness convention was a form of worship and religious study, that it was his responsibility to attend, and that he had regularly attended in the past. His daughter testified that each congregation was encouraged by the church to attend the convention set for that particular congregation, here June 27 and 28, and that she, her father, and other family members had done so since 1983. The Commission apparently credited this testimony, and we must accept its resolution of that issue. (See *Johnson Controls, Inc. v. Fair Employment & Housing Com.*, *supra*, 218 Cal.App.3d at p. 531.)

Gemini argues that there is insufficient evidence in the record to establish that the convention at issue was in fact the convention scheduled for Young's congregation. We perceive no legal significance to the argument. The fact is that Young sought to attend a specific religious convention and Gemini made no attempt to accommodate him. To the extent the dates of June 27 and 28 were in conflict with Gemini's needs, rescheduling would have been an appropriate subject to raise in any attempt by the employer to accommodate the belief or observance. (See *Soldinger v. Northwest Airlines, Inc.*, *supra*, 51 Cal.App.4th at p. 370.) But Gemini's outright denial precluded any attempt at accommodation.

---

[6] When the issue arises whether a belief or set of beliefs constitutes a religion, however, " 'a court must, at least to a degree, examine the content of the supposed religion, not to determine its truth or falsity, or whether it is schismatic or orthodox, but to determine whether the subject matter it comprehends is consistent with the assertion that it is, or is not, a religion.' [Citation.]" (*Friedman v. Southern Cal. Permanente Medical Group*, *supra*, 102 Cal.App.4th at p. 60 [veganism].) No one claimed here that the Jehovah's Witness sect was not a religion, and courts have recognized it as a religion for some time. (See, e.g., *Murdock v. Pennsylvania* (1943) 319 U.S. 105, 107–109 [87 L.Ed. 1292, 63 S.Ct. 870].)

Substantial evidence also supports the Commission's finding with regard to the other two elements of the Department's prima facie case of religious discrimination—that Gemini was aware of Young's belief and its conflict with an employment requirement. (See *Friedman v. Southern Cal. Permanente Medical Group, supra,* 102 Cal.App.4th at p. 45.) Gemini claims that its "decision-makers" did not know that Young had a religious reason for requesting the time off "until literally hours before he left."

The decision makers were the members of the management committee and Kaufman was a member of that committee. And, on June 16, 1997, Kaufman knew Young was a Jehovah's Witness and wanted the days off to attend his annual religious convention. Kaufman did not testify at the administrative hearing; thus the record is silent why he did not share his knowledge with the others at the time he first presented Young's request.

■ Gemini has provided no authority for the suggestion, implicit in its contention, that *all* the decision makers had to be informed of Young's religious needs before it had any obligation to attempt an accommodation. A supervisor is the employer's agent for purposes of vicarious liability for unlawful discrimination. (See *Reno v. Baird* (1998) 18 Cal.4th 640, 645–647 [76 Cal.Rptr.2d 499, 957 P.2d 1333] and *Freeman v. Superior Court* (1955) 44 Cal.2d 533, 537 [282 P.2d 857] [in general, when an agent has acquired knowledge which he or she had a duty to communicate to his or her principal, a conclusive presumption arises that the agent has performed that duty].)

Gemini does not claim that it was not Kaufman's duty to communicate Young's request to the committee and Young testified that he was required to make the request through Kaufman. Jackie Naeg, Gemini's general manager, testified that Kaufman presented Young's request the same day it was first made, or the next day, and that all communication with Young was expected to go through Kaufman. Naeg and Allan Hardy, Gemini's founder and president, both testified that Kaufman was asked to obtain additional information from Young. Kaufman's knowledge was therefore Gemini's knowledge. (See *Freeman v. Superior Court, supra,* 44 Cal.2d at p. 537.)

■ Gemini also contends that it was not required to accommodate Young's request until he explained his religious beliefs to his employer and provided enough information about his religious needs for Gemini to understand the *significance* of the convention and how his attendance was tied to his religious beliefs. We disagree. Notice to the employer does not require a complex explanation. (See *Heller v. EBB Auto Co., supra,* 8 F.3d at p. 1439.) The employee needs only to cite a religious connection. (See *Redmond v. GAF Corp.* (7th Cir. 1978) 574 F.2d 897, 899–902, hereafter *Redmond.*)

Gemini contends that the word "convention" was insufficient to impart notice that the convention in question was a religious observance. In the abstract that is probably correct. But here Young told Kaufman he was a Jehovah's Witness and that the convention was a religious convention. In *Redmond, supra,* 574 F.2d 897, an employee, a Jehovah's Witness, was requested to participate in an annual inventory on a Saturday, usually a non-work day for the employer. The employee had a conflict because he taught a Bible class on Saturdays so he told the employer he had a "religious obligation" that day and would be unable to participate. The employee was terminated. The Seventh Circuit agreed with the trial court that a duty to accommodate the employee's religious obligation was triggered when he told the employer he had a "religious obligation" and would be unable to attend the inventory. (*Redmond, supra,* 574 F.2d at p. 902.) We perceive no significant distinction between an employee telling an employer he had a "religious obligation" which triggers a duty to accommodate and what Young told Gemini here: that he was a Jehovah's Witness and he was scheduled to attend a *religious convention.*

Gemini contends that there was no evidence establishing that Young's attendance at the convention conflicted with an employment requirement. Hardy testified that the company's normal operating days are Monday through Friday. Thus, it may be reasonably inferred that Young had an employment requirement to work on at least the first day of the convention, Friday, June 27, 1997. And if there was no conflicting employment requirement, how does Gemini explain its imposition of a suspension on Young for missing work Friday and Saturday?

Gemini also contends that there was no conflict with an employment requirement, because Young could have rescheduled his attendance to one of the later conventions scheduled in Long Beach on July 18, 19, and 20, 1997, and August 8, 9, and 10, 1997. Since Monday through Friday, and sometimes Saturday, were work days at Gemini, it follows that at least one day of each convention will fall on a work day. Simply rescheduling the conflict hardly eliminates it. (Cf. *Heller v. EBB Auto Co., supra,* 8 F.3d at p. 1438.)

■ Since the Department established a prima facie case, the burden shifted to Gemini to "establish it initiated good faith efforts to accommodate or no accommodation was possible without producing undue hardship. [Citations.]" (*Soldinger v. Northwest Airlines, Inc., supra,* 51 Cal.App.4th at p. 370.)

Gemini did not assert hardship, and the Commission found that Gemini failed to initiate an effort to accommodate Young's religious belief. That finding is supported by substantial evidence, as well. On June 16, 1997, two

weeks in advance, Young requested time off to attend his religious convention, which was initially denied for failure to explain why Young needed the time off. It was not until June 25 that Kaufman asked Young to sign a new request Kaufman prepared that day. Young was never asked to appear before the management committee, was never asked for more information, and was never personally contacted by anyone other than Kaufman.

Gemini blames Young for its own failure to initiate good faith efforts to accommodate his religious observance, claiming that Young failed to follow the company's written policy requiring "documentation" to be submitted with leave requests.[7] But Hardy admitted that it was *Kaufman* who failed to follow the established procedures. Young testified that he was never told that he was required to provide anything but the verbal request. No one even mentioned the policy to him. The committee never requested Young to provide either documentation or an explanation.

Even if Young could be faulted for the absence of "documentation," it does not follow that this somehow prevented Gemini from at least *initiating an attempt* to reach an accommodation. We agree with the Commission's finding that Gemini's written policy was ambiguous, but the issue does not turn on any ambiguity in the policy or Young's compliance with it, since "an individual's religious beliefs must be accommodated even where it means making an exception to a rule which is reasonably applied to other individuals with different beliefs. [Citation.]" (*Best v. California Apprenticeship Council* (1984) 161 Cal.App.3d 626, 636 [207 Cal.Rptr. 863]; cf. *Soldinger v. Northwest Airlines, Inc., supra,* 51 Cal.App.4th at p. 373 ["California's anti-discrimination statutes . . . demonstrate California's intent not to allow its laws to be circumvented by private contracts"].)

## 2. *Retaliation*

"It shall be an unlawful employment practice . . . [¶] [f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or

---

[7] That policy provides, "Any absences required for other reasons not including the above [emergencies] must be requested 72 hours in advance with written documentation. Requests such as medical surgery, court appearances, and child birth will be considered. All requests will not be considered without the written documentation in advance. [¶] At the time of notification the supervisor will assist and submit a written request for leave along with a copy of the document to personnel. The personnel department will then make a determination and ruling . . . on a case by case basis." Whatever "documentation" means in the policy, it appears to have been the supervisor's obligation to obtain it and submit it to the personnel department.

because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).)[8]

■ A claim under section 12940, subdivision (h), is established if the claimant shows a prima facie case of retaliation and, if the employer articulates a legitimate nonretaliatory explanation for its acts, the claimant shows that the proffered explanation is merely a pretext for unlawful discrimination. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476 [4 Cal.Rptr.2d 522].) The claimant establishes a prima facie case by showing that the employee "engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action. [Citations.]" (*Ibid.*)

A causal link may be established with evidence demonstrating that the employer was aware of the protected activity and the adverse action followed within a relatively short time. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 [105 Cal.Rptr.2d 652].) The Commission found evidence of both factors, and substantial evidence supports the finding.

Young testified that when Kaufman informed him of the committee's denial, Young protested the decision, telling Kaufman that it was his religious responsibility to go, and he went. Three days later, he was suspended.

Then, when he learned of the suspension, Young told Kaufman that it was unfair, because his need to attend the convention was a religious one. Soon afterward, on July 2, 1997, Young called Kaufman, told him that he was going to the "labor board," and asked for the letter he had written to Naeg or Hardy. The same day, Kaufman gave Naeg a written memorandum, stating that Young had asked for a copy of the time-off request, and that he had an appointment with the "labor board" on July 9. On July 9, Young filed an administrative complaint regarding his suspension. Gemini's management committee met the same day, and decided to terminate Young.

■ Informal complaints to management about discriminatory employment practices are considered sufficient opposition to trigger the prohibition against retaliation. (See *Sumner v. United States Postal Service* (2d Cir. 1990) 899 F.2d 203, 209 [opposition under Title VII].) Thus, by protesting Gemini's failure to attempt to accommodate his religious observance, and then by complaining to Kaufman that the suspension was unfair because of his religious needs, Young engaged in protected activities for which Gemini was forbidden to retaliate.

---

[8] This provision was found in subdivision (f) in 1997. See footnote 5, *ante.*

■ Threatening to file a discrimination complaint is a protected activity. (See *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 814 [89 Cal.Rptr.2d 505].) Gemini contends that Young's statement that he intended to go to the "labor board" could not give rise to a retaliation claim, because Young testified that he thought the "labor board" handled complaints about unemployment, and this shows, Gemini claims, only that it was aware that Young intended to file a *wage* claim or a claim for unemployment benefits.[9]

■ The Commission expressly found that in spite of Young's mistaking the name of the agency responsible for employment discrimination claims, the import of Young's intention to complain of religious discrimination was brought home to Gemini's management. We must draw all reasonable inferences in favor of the decision. (*Johnson Controls, Inc. v. Fair Employment & Housing Com., supra*, 218 Cal.App.3d at p. 531.) And "all reasonable doubts must be resolved in favor of the Commission's findings. [Citation.]" (*County of Fresno v. Fair Employment & Housing Com.* (1991) 226 Cal.App.3d 1541, 1548 [277 Cal.Rptr. 557].) "The court may reverse the Commission only upon determining a reasonable person could not reach the conclusion reached by the Commission. [Citations.]" (*Id.* at p. 1548.)

Since Young told Kaufman that the suspension was unfair because leave was requested for a religious reason, it may be reasonably inferred that Young meant, and the committee understood, that Young intended to file a religious discrimination complaint with the appropriate agency, which is just what he did.

In any event, Gemini's "labor board" argument is a straw man, the shooting down of which would make no difference to the outcome of this appeal. Gemini's argument assumes that Young's telling Kaufman that he planned to go to the "labor board" was the only protected activity in which Young engaged prior to Gemini's adverse actions against him. We have already found substantial evidence to support several protected activities of which Gemini was aware, since they were communicated to Kaufman, a member of the management committee.

Thus, whatever Gemini may claim to have understood "labor board" to mean, the Department established a prima facie case by showing that Young also engaged in other protected activities, soon after which Gemini subjected

---

[9] Young based his belief upon one experience at a different place of employment, where a union member's grievance was heard by the "labor board." Young's testimony suggests that he had the National Labor Relations Board in mind. (See 29 U.S.C. § 153 et seq.) Claims for unemployment benefits are not made to the "labor board," but to the Employment Development Department. (See Unemp. Ins. Code, § 301.) Claims for unpaid wages are not made to the "labor board," but made to the Labor Commissioner. (See Lab. Code, § 96.7.)

him to adverse employment actions. (See *Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 476.) Further, a causal link was established with evidence demonstrating that the employer was aware of the protected activities and the adverse actions followed each within a relatively short time. (See *Morgan v. Regents of University of California, supra,* 88 Cal.App.4th at p. 69.)

Relying upon *Chen v. County of Orange* (2002) 96 Cal.App.4th 926 [116 Cal.Rptr.2d 786], Gemini contends that evidence of its awareness of protected activity and the close timing of adverse action is insufficient, without more, to establish a causal connection. We find no such broad rule enunciated in that case. The court held that timing alone was insufficient to prove unlawful discrimination *in that particular factual context,* which showed that the employee had failed to meet her burden to prove that her employer's legitimate reasons not to promote her were a pretext for unlawful discrimination. (See *id.* at pp. 930–931, 949–951.)

 A discussion of pretext is premature until the employee establishes the prima facie case and the employer offers a legitimate, nondiscriminatory reason for the adverse employment action. (See *Ewing v. Gill Industries, Inc.* (1992) 3 Cal.App.4th 601, 614 [4 Cal.Rptr.2d 640].)

Gemini also relies upon *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108 [75 Cal.Rptr.2d 27] to support a contention that a prima facie case of discrimination cannot be established by timing alone, where the employee engaged in the protected activity only after being investigated or disciplined for misconduct. In *Guthrey,* the evidence established that, unlike here, the employee had violated lawful and nondiscriminatory procedures and policies, and the employer's actions that led to the disciplinary action would have been taken in any event. (See *id.* at pp. 1117–1118.) Young's discipline, on the other hand, was not based upon "misconduct," but was imposed after he engaged in protected activity, objecting to Gemini's failure to attempt to accommodate his religious belief and observance.

 Thus, we conclude that substantial evidence of the two factors, the employer's awareness of the protected activities and adverse action that followed within a relatively short time, is sufficient to raise an inference of a causal connection. (See *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615 [262 Cal.Rptr. 842]; *Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 476.) We therefore turn to Gemini's burden to produce substantial evidence of a legitimate, nondiscriminatory reason for the adverse employment action. (*Morgan v. Regents of University of California, supra,* 88 Cal.App.4th at p. 68.)

Gemini contends that its legitimate, nondiscriminatory reason for terminating Young was that it "believed Young had been blatantly insubordinate and failed to comply with its attendance policy by not providing documentation of his June absences." We agree that this was, in essence, the reason that was given to Young for his termination. But the evidence does not compel a finding, as Gemini suggests, that this was the reason that actually motivated the termination.

Hardy initially testified that it was not the documentation problem that caused them to fire Young, but the fact that the committee members disbelieved Young. Moments later, he testified that it *was* the absence of documentation. Naeg testified with regard to her understanding of what documentation the written policy requires, explaining that for most absences, the documentation consists of doctors' notes or "INS letters." She thought that Young should have provided an admission ticket or receipt, or a hotel confirmation.

Hardy testified that he would have accepted a personal note stating the reason for the request. Hardy explained, "I was thinking maybe he had some other kind of problem that—that's not a personal thing. That's a right that he's entitled to. I mean, if the man is not proud of his religion, maybe he shouldn't belong to them people. Making—giving them a bad name. . . . [¶] I mean, I have no problem with religion. I know Hispanics don't have a problem with professing that they're Catholic or whatnot. Most of them are Catholic, but I have no problem with that. And they don't have a problem with it. What makes Lester have a problem with it?" Although Young personally signed Kaufman's memo dated June 25, 1997, and that memo did, in fact, refer to Young's religious reason, Hardy did not consider it to be sufficient, because it was not a *personal* note.

Hardy then again backed away from the documentation requirement, suggesting that he would have granted the request if Young had made it in person: "All he has to do is talk to us, and . . . the attitude he took was that it was personal. He knows better than that. . . . You either growed up or you don't." Since Young knew Hardy's home phone number, and Hardy claimed that his door was always open, Hardy felt that Young's failure to come to him personally was "blatant disregard."

Thus, it appears that enforcement of the policy was not rigid and that Young would not necessarily have been fired for violating it, had he spoken personally to Hardy or written him a personal note.

But Naeg and Hardy admitted that the committee never requested Young to provide documentation, a note, a personal visit, or a reason for the absence, and never attempted to communicate directly with Young. Young testified that

Kaufman never asked him for any documentation, and that he never mentioned the written policy. We assume the Commission believed him. (See *Johnson Controls, Inc. v. Fair Employment & Housing Com., supra,* 218 Cal.App.3d at p. 531; Code Civ. Proc., § 1094.5, subds. (b), (c).) And since Kaufman did not testify, we infer that his testimony would have supported Young's. (See *Talizin v. Oak Creek Riding Club* (1959) 176 Cal.App.2d 429, 434 [1 Cal.Rptr. 514]; Evid. Code, § 413.)

 In any event, the burden does not shift to the employee to prove that the employer's proffered reason is a pretext until the employer shows "that the procedure by which the employee was terminated was 'validly and fairly devised and administered to serve a legitimate business purpose.' [Citation.]" (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224 [87 Cal.Rptr.2d 487].)

Since the Commission's findings did not include a discussion of pretext, we infer a finding that the burden did not shift to the Department to establish pretext. (*Mahoney v. San Francisco City etc. Employees' Ret. Bd.* (1973) 30 Cal.App.3d 1, 4–5 [106 Cal.Rptr. 94] [findings may be implied in a review under Code Civ. Proc., § 1094.5].)

Substantial evidence supports the Commission's implied finding. Gemini did not show the leave request procedure to have been fairly devised or administered. The Commission found it to be ambiguous, and we have agreed.[10] The documentation requirement was vague enough to permit Gemini to be dissatisfied with almost any document submitted. Naeg thought that Young should have submitted a convention ticket or a hotel receipt, but the written policy does not express such a requirement, no one communicated it to Young, and Naeg admitted that the policy was not written in very good English.[11]

The policy contained no safeguard against unlawful discrimination, and Naeg admitted that she knew of no procedure to redress discrimination. Hardy would have waived the policy upon a personal visit or note from Young, and appears to have resented Young for not having volunteered information about his religion.

---

[10] See our discussion in part 1, *ante.*

[11] Young thought that he complied with the policy. His understanding of the policy was that he was to make a verbal request at least 72 hours in advance, which he did, and that his supervisor was then required to write it up and submit it. Young did not understand "documentation" to mean anything more than the written request submitted by his supervisor. He interpreted the policy to mean that it was the supervisor's responsibility to submit the appropriate documentation.

In any event, if it could be said that the burden shifted, substantial evidence supports a finding that the attendance policy was a pretext for unlawful discrimination. "Pretext may be demonstrated by showing '. . . that the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge. [Citation.]' [Citation.]" (*Hanson v. Lucky Stores, Inc., supra,* 74 Cal.App.4th at p. 224.)

 First, the proffered reason for the discharge, insubordination for refusing to provide documentation, was unbelievable, since Young was never asked for documentation, either before or after the convention, and Young had already been disciplined for the same reason. While an inference of intentional discrimination cannot be drawn solely from evidence showing the employer to be unworthy of credence, it is circumstantial evidence that may be probative when considered together with the elements of the prima facie case. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 359–360 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 148–149 [147 L.Ed.2d 105, 120 S.Ct. 2097].)

"Pretext may also be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination. [Citation.]" (*Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 479.)

The timing of the discharge, as we have discussed, was suspiciously quick, nine days after Young complained to Kaufman about the suspension, calling it unfair because of his religious needs, and one week after he told Kaufman that he intended to take his complaint to the "labor board."

Although the committee unanimously made the decision, Hardy's testimony shows that he had the authority to make it on his own, and he gave inconsistent reasons—it was *not* the documentation; it *was* the documentation; he would have accepted a personal visit or note.

Most telling was Young's job performance before termination. Young had perfect attendance in the fifteen months that he worked at Gemini. He worked a double shift when necessary. Young was originally hired to supervise all three extrusion shifts, and would voluntarily put in 12-hour days, even after Kaufman and Spencer were hired as manager trainees in order to allow Young to work fewer hours.

Hardy testified that Young was the most qualified and experienced individual he had ever hired in his 45 years in the extrusion business. It takes years of training to become as proficient as Young was, and he was more qualified than anyone except Hardy to handle any production activity in the plant. There was no evidence of any complaint about Young's work prior to his attending the convention.

In sum, since the leave request procedure was not shown to be fairly devised or administered, the burden did not shift to the Department to show that it was a pretext for unlawful discrimination. (See *Hanson v. Lucky Stores, Inc., supra,* 74 Cal.App.4th at p. 224.) And if Gemini's showing had been sufficient to shift the burden to prove pretext, the substantial evidence of Gemini's lack of credibility, the timing of the action, Hardy's authority and attitude, and Young's excellent work record would have been sufficient to meet that burden. (See *Reeves v. Sanderson Plumbing Products, Inc., supra,* 530 U.S. at pp. 148–149; *Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at pp. 359–360; *Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 476.)

 The bottom line is that the perceived disobedience was triggered by Gemini's failure to attempt to accommodate Young's religious belief. Gemini cannot justify terminating an employee for perceived disobedience triggered by its own violation of the FEHA.

### 3. *Failure to Prevent Discrimination*

Employers are required to "take all reasonable steps necessary to prevent discrimination" in the workplace. (§ 12940, subd. (k).)[12]

 One such reasonable step, and one that is required in order to ensure a discrimination-free work environment, is a prompt investigation of the discrimination claim. (*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.* (2002) 103 Cal.App.4th 1021, 1035 [127 Cal.Rptr.2d 285].) Gemini made no investigation. Instead, it retaliated.

 Gemini contends that its attendance policy was a reasonable step, because, it claims, it was applied equally, requiring documentation from all employees, including those who wished to attend baptisms, christenings, funerals, confirmations, and religious retreats. An employer's claim that its procedures are effective in addressing discrimination is negated by proof of retaliation. (Cf. *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1045 [6 Cal.Rptr.3d 441, 79 P.3d 556] [avoidable consequences defense].)

---

[12] This provision was contained in subdivision (h) in 1997. See footnote 5, *ante.*

██ Other reasonable steps an employer might take include the establishment and promulgation of antidiscrimination policies and the implementation of effective procedures to handle complaints and grievances regarding discrimination. (Cf. *State Dept. of Health Services v. Superior Court, supra,* 31 Cal.4th at p. 1047 [avoidable consequences defense]; also cf. *Montero v. AGCO Corp.* (9th Cir. 1999) 192 F.3d 856, 862–863 [similar defense under Title VII].)

Naeg testified that Gemini's management committee was primarily concerned with workplace safety, and its training with regard to state regulations was limited to OSHA regulations.[13] Gemini had not developed a complaint or grievance procedure relating to discrimination. It merely posted bulletins provided by state agencies and mandated by law. And there was no policy addressing religious accommodation.

An employer must take *all* reasonable steps necessary to prevent discrimination. (§ 12940, subd. (k).) Gemini took none.

### 4. *Gemini's Appeal*

Gemini claims entitlement to attorney fees under Code of Civil Procedure section 1021.5, the private attorney general statute, which provides for an award of attorney fees under specified circumstances to the *successful* party whose judgment conferred a significant benefit on the general public or a large class of persons.

Gemini also seeks attorney fees under Government Code section 12965, subdivision (b), which provides for a discretionary attorney fee award to the *prevailing* party in a civil action filed against and employer to redress unlawful discrimination.

We need not reach the merits of Gemini's contention that these two statutes apply in this case, since we shall reverse the judgment and direct the trial court to deny the petition, and Gemini will no longer be the successful or prevailing party.

---

[13] See the California Occupational Safety and Health Act of 1973, Labor Code section 6300 et seq., and its federal counterpart, the Occupational Safety and Health Act of 1970, 29 U.S.C. section 651 et seq.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to vacate the writ of mandate and enter a new order denying the petition for writ of mandate. The Department shall recover costs on appeal.

Curry, J., and Grimes, J., concurred.

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A petition for a rehearing was denied October 19, 2004, and the petition of appellant Gemini Aluminum Corporation for review by the Supreme Court was denied December 22, 2004. Werdegar, J., did not participate therein.