**Napoleon ANDREWS, Plaintiff,**

**v.**

**PRIDE INDUSTRIES and Jean Zurbuchen, Defendants.**

**No. 2:14-cv-02154-KJM-AC**

United States District Court, E.D. California.

Signed September 30, 2016

Andrea Rosa, The Rosa Law Group, Elk Grove, CA, for Plaintiff.

David M. Daniels, Gilbert, Kelly, Crowely & Jannett LLP, Roseville, CA, Jennifer Calderon Schmuldt, Gilbert, Kelly, Crow-

ley & Jennett, LLP, Los Angeles, CA, for Defendants.

## ORDER

Kimberly J. Mueller, UNITED STATES DISTRICT JUDGE

From May 2009 until November 2012, Napoleon Andrews worked for PRIDE Industries, leading a crew of disabled employees at Travis Air Force Base (AFB) in Fairfield, California. Starting in May 2012, Mr. Andrews went on leave under the Family and Medical Leave Act (FMLA), taking an extended absence he attributed to stress and anxiety stemming from racial and disability discrimination in the workplace. Near the end of his FMLA leave, Mr. Andrews was terminated. In September 2014, Mr. Andrews filed this suit against PRIDE and his supervisor there, Jean Zurbuchen, alleging a variety of violations, including racial and disability discrimination, retaliation, harassment, and wrongful termination. After the close of discovery, both defendants have moved for summary judgment.

At hearing on defendants' motion, Andrea Rosa appeared for Mr. Andrews, and David Daniels and Jennifer Calderon Schmuldt appeared for PRIDE and Ms. Zurbuchen. ECF No. 86. As explained below, defendants' motion is GRANTED in PART and DENIED in PART.

## I. PROCEDURAL HISTORY

Mr. Andrews originally filed this action against PRIDE and Ms. Zurbuchen on September 16, 2014 in the Solano County Superior Court. First Am. Compl. (FAC), ECF No. 3. He asserted the following six claims: (1) disability discrimination and failure to accommodate; (2) failure to engage in the interactive process; (3) race discrimination; (4) hostile work environment; (5) failure to prevent discrimination;

and (6) wrongful termination in violation of public policy. FAC at ¶¶ 72–125. With the exception of Mr. Andrews' common law wrongful termination claim, all claims alleged violations of the California Fair Employment Housing Act (FEHA). *See id.* Defendants then removed the case to this court, contending the federal enclave doctrine, discussed in more detail below, establishes federal jurisdiction. Not. Remov. 2, ECF No. 2. After removal, defendants filed a motion to dismiss. ECF No. 6.

### A. Motion to Dismiss First Amended Complaint

In their motion to dismiss, defendants argued the federal enclave doctrine precluded Mr. Andrews' state-law claims. *Id.* at 5–7. Essentially, defendants argued the conduct giving rise to Mr. Andrews' claims occurred on Travis AFB, a federal enclave, and any attempt to subject such conduct to state regulation was precluded. *Id.*

Defendants did not prevail on this theory because it was unclear whether David Grant Medical Center, a later-acquired unit at Travis AFB where the alleged discrimination and retaliation took place, was a federal enclave not subject to state regulation. Order on MTD (Prev. Order) 7–8, ECF No. 18. In denying defendants' motion to dismiss, the court allowed Mr. Andrews the opportunity to conduct discovery on the federal enclave issue, as well as leave to file a second amended complaint. *Id.* at 9.

### B. Second Amended Complaint

Mr. Andrews' second amended complaint asserts the same state-law claims as his first amended complaint, but further asserts the following federal claims: (1) race discrimination in violation of 42 U.S.C. § 1981; (2) retaliation also in violation of § 1981; (3) discriminatory termination in violation of the FMLA; and (4)

retaliation also for exercising the right to FMLA leave. *See generally* Second Am. Compl. (SAC), ECF No. 25. Mr. Andrews' suit is grounded on federal question and supplemental jurisdiction. 28 U.S.C. §§ 1331, 1367.

Defendants now move for summary judgment. Mot., ECF No. 65. Mr. Andrews opposes the motion, Opp'n, ECF No. 80, and defendants have replied, Reply, ECF No. 81.

## II. FACTUAL BACKGROUND

The following facts are undisputed unless otherwise stated. Where a genuine dispute exists, the court draws reasonable inferences in favor of Mr. Andrews. *Tolan v. Cotton*, — U.S. —, 134 S.Ct. 1861, 1868, 188 L.Ed.2d 895 (2014) (per curiam).

### A. PRIDE Hires Mr. Andrews

PRIDE Industries is a federal contractor; it services Travis AFB. Undisputed Material Fact (UMF) No. 1, ECF No. 80-5; Prev. Order at 7. Napoleon Andrews was hired as Grounds Maintenance Lead in May 2009, and was responsible for leading a crew of employees with disabilities in landscaping duties. UMF No. 3. He also was responsible for maintaining the grounds of buildings on the base, cutting grass with lawn mowers, and trimming hedges. Walters Decl. ¶ 11, ECF No. 70. Jean Zurbuchen was the Manager of Grounds Maintenance at PRIDE, and Mr. Andrews' supervisor. Walters Decl. ¶ 8.

Mr. Andrews is African-American and speaks fluent Spanish. Andrews Decl. ¶ 2, ECF No. 80-2; Andrews Dep. 440:25–441:6.

### B. May 2010 to May 2012: Disciplinary Write-ups

Soon after Mr. Andrews started work at PRIDE, he began to receive a series of disciplinary write-ups. Walters Decl. ¶¶ 16–20; Ex. C. For example, in May 2010, Mr. Andrews was sanctioned for "failure to follow instructions" when he did not complete paperwork after mowing around two buildings on the base. Walters Decl. Ex. C at 22. On August 13, 2010, Mr. Andrews received a written warning for arriving at work fifteen minutes late. *Id.* On July 15, 2011, Mr. Andrews received a document titled "final written warning" for a "safety violation," due to driving a PRIDE truck with its tailgates unsecured. *Id.* Despite receiving a "final warning," Mr. Andrews continued to work for PRIDE. On August 8, 2011, Mr. Andrews was disciplined for unnecessarily spraying an area for weeds. *Id.* On February 22, 2012, Mr. Andrews received another "final written warning" for failure to follow instructions and poor work performance, because he did not report that work under his supervision was "incomplete." *Id.* Again, Mr. Andrews was allowed to continue working. While the record does not make clear who delivered the disciplinary write-ups to Andrews, Ms. Zurbuchen signed the written warnings. *See id.* at 26–36.

During the same time period Mr. Andrews received these write-ups, PRIDE also gave Mr. Andrews performance reviews. *Id.* 37–39. According to a June 2010 performance review, Mr. Andrews was rated as "meeting expectations" in the following areas: (1) team player and presenting a positive, courteous attitude toward all employees; and (2) providing customer service through demonstrative courtesy and respect towards customers. *Id.* Mr. Andrews met expectations but needed improvement or training in attendance, job knowledge, initiative, and quality or quantity of work. *Id.* The performance review further noted Mr. Andrews was a positive lead, "but needs to show his guys that he can be a leader and get them to work the way he

wants them to." *Id.* Mr. Andrews received the same ratings in his June 2011 performance review, except the review noted Mr. Andrews "needs to work with his crew on all times even when spraying or working on paper work." *Id.*

His disciplinary write-ups notwithstanding, Mr. Andrews was neither demoted nor was his pay decreased. *Id.* ¶ 13. During a morning roll call at Travis AFB on April 30, 2012, however, PRIDE management publicly announced Mr. Andrews would be reassigned from his Grounds Maintenance Lead position to a lower-level detail position. Andrews Decl. ¶ 17, ECF No. 80-2. Ms. Zurbuchen was partially responsible for this decision, as it was part of her responsibility to decide where to assign Ground Maintenance Leads. *Id.*; Walters Decl. Ex. C. Although the lower-level detail position did not involve a pay cut, Mr. Andrews would lead fewer employees and would be subject to daily assignment changes. Andrews Decl. ¶ 17. He was initially told he would be in this position for one week, but the position was later extended to two weeks. *Id.* Before the two weeks ended, Mr. Andrews went out on leave, as described below.

## C. May 2009 to May 2012: Discriminatory Treatment

Also during the same time period he received disciplinary write-ups, Mr. Andrews witnessed and personally experienced discriminatory treatment. Andrews Dep. 443:2–14. For example, when a Caucasian co-worker ruptured a main water line to a building Andrews described as "one of the most important buildings" at the AFB, PRIDE supervisors commented, "Oh, wasn't that cute, [the coworker] hit that pipe?" *Id.* 443:2–14. When another Caucasian co-worker was insubordinate with a union representative, the co-worker did not receive a write-up, and no disciplin-

ary action was taken. *Id.* 447:24–448:15. The record does not make clear whether these co-workers had a disability, as some PRIDE employees do. Mr. Andrews, by contrast, received several citations for offenses he deems less serious, as noted above.

Mr. Andrews also witnessed and experienced treatment by Ms. Zurbuchen that he considered unfair. In particular, Mr. Andrews alleges Ms. Zurbuchen forbid him from speaking Spanish in the workplace, and often referred to his Mexican coworkers as "the Mexican Mafia." Rosa Decl. ¶ 18, Exhibit Q, ECF No. 80-1; Andrews Dep. 49:5–8, 50:10–13. In his declaration, Mr. Andrews stated because many of his co-workers were Spanish monolingual speakers, it was important for him to speak and write Spanish so he could help his crew or other laborers understand what was being asked of them. Andrews Decl. ¶ 6. Because many PRIDE supervisors and managers did not speak Spanish, very few people other than Mr. Andrews could assist his co-workers. *Id.* However, other evidence in the record suggests speaking Spanish in the workplace was allowed, and the prohibition on speaking Spanish was acceptable only "under limited circumstances," such as speaking to a manager who only speaks English or in an emergency situation. Rosa Decl. Ex. Q at 145.

Ms. Zurbuchen also called Mr. Andrews "slow," on numerous occasions, and at least once threatened to terminate Mr. Andrews by showing him pictures of minorities who had been fired or wrongfully terminated at PRIDE while telling him, "You could be in this group." Andrews Dep. 49:8, 49:22–50:4. Ms. Zurbuchen also uttered the word "nigger" in front of Mr. Andrews, in the context of asking whether Mr. Andrews himself used that word at work. Andrews Dep. 49:8–10. At his depo-

sition, Mr. Andrews testified Ms. Zurbuchen's comments caused him to feel intimidated and to lose concentration while at work. Andrews Dep. 48:6–22.

### D. May 7, 2012: Leave from PRIDE

As mentioned, the discriminatory treatment he witnessed and experienced caused Mr. Andrews "memory loss, anxiety, and [an] inability to concentrate." Andrews Dep. 45:24–46:1. In particular, Mr. Andrews had difficulty concentrating on his job without seeming anxious or fidgety or having to leave work for short periods of time. Andrews Dep. 46:19–47:4. On May 7, 2012, he went on leave from his job at PRIDE under the FMLA. Andrews Dep. 227:14–228:18; Walters Decl. ¶¶ 28–29. Mr. Andrews made numerous requests to extend his leave, reviewed below. UMF Nos. 37, 39.

### E. Requests for Extended FMLA Leave

In support of his initial request for FMLA leave, Mr. Andrews' primary doctor Dr. Tuan Doan, gave Mr. Andrews a medical note, dated May 7, 2012, stating "unable to work since May 7, 2012, due to medical illness, return back to work on May 21, 2012," which Dr. Doan submitted to PRIDE. UMF No. 33; Walters Decl. ¶¶ 25, 28. The parties dispute whether PRIDE actually received Dr. Doan's note. *Compare* Walters Decl. ¶¶ 25, 28, *with* Andrews Decl. ¶ 19. On the one hand, Mr. Andrews avers Dr. Doan faxed the note to PRIDE on May 7, 2012, Mr. Andrews' first day of FMLA leave. Andrews Decl. ¶ 19. On the other hand, PRIDE says it did not receive the May 7 note, but instead, received an different note on May 16, 2012 requesting leave until August 4, 2012. Walters Decl. ¶ 25. PRIDE avers that from May 8, the day after Mr. Andrews went on leave, until May 15, 2012, PRIDE received no communication from Mr. Andrews. Wal-

ters Decl. ¶ 28. In any event, PRIDE cites to evidence showing that on May 16, 2012, it granted Mr. Andrews' request for leave, and extended his leave from July 31 to August 4, 2012. *Id.*

### F. Second Request for Extended Leave

The same day PRIDE granted Mr. Andrews' request for extended FMLA leave, it also requested that Mr. Andrews complete and return paperwork. Walters Decl. ¶ 29. Mr. Andrews did not return the paperwork to PRIDE. Walters Decl. ¶ 30. However, Mr. Andrews submitted a new medical note from Dr. Doan, dated July 25, 2012, in support of extending his medical leave from August 4, 2012 to November 4, 2012. UMF No. 39. Before granting this request, PRIDE ordered Mr. Andrews to obtain answers from Dr. Doan to a reasonable accommodations questionnaire by August 16, 2012. UMF No. 40.

Dr. Doan completed the questionnaire on August 6, 2012, but PRIDE did not receive it until August 27, 2012. UMF No. 42. In the questionnaire, Dr. Doan noted Mr. Andrews had stress disorder, generalized anxiety disorder, as well as a latex allergy. Walters Decl. Ex. J at 59–66. These conditions affected at least four major life activities including breathing, working, concentrating, and interacting with others. *Id.* Dr. Doan also noted the medication for Mr. Andrews' conditions would prevent him from operating heavy machinery, and this restriction was expected to last until October 30, 2012. *Id.*

PRIDE interpreted the questionnaire to mean Mr. Andrews would be able to return to work after October 30, 2012, and issued a letter granting Mr. Andrews' request to extend his leave to that date. Walters Decl. Ex. K. Specifically, it granted Mr. Andrews' second request in an October 2, 2012 letter, which stated in part,

If you are able to return to work on October 31, 2012, you must provide [a] note from your doctor that clears you to return to work and that lists any and all restrictions. Please contact your Local HR Representative, Andre Anthony at [phone number provided] by October 23, 2012 to either provide the return to work note and to arrange for your return to work, or to resign your position.

*Id.* The parties dispute whether October 23 was a hard deadline or a due date contingent on whether Mr. Andrews was able to return to work on October 31, 2012. *Compare* Walters Decl. ¶ 35 *with* Andrews Decl. ¶ 35. PRIDE argues the letter clearly required Mr. Andrews to contact Andre Anthony by October 23, 2012. Walters Decl. ¶ 35. Mr. Andrews argues the letter required him to contact Andre Anthony by October 23, 2012 only if he was able to return to work by October 31, 2012. Andrews Decl. ¶ 35. Mr. Andrews understood he did not have to respond to PRIDE because he was unable to return to work by October 31. *Id.* Regardless, Mr. Andrews neither returned the paperwork nor indicated a desire to resign his position by October 23, 2012. Walters Decl. ¶ 37.

### G. Third Request and Termination

On October 22, 2012, PRIDE received another medical note from Dr. Doan, dated October 16, 2012, requesting a third extension of leave for Mr. Andrews to adjust his medications, and stating that Mr. Andrews could return to work on November 16, 2012. Walters Decl. ¶ 36; Ex. L. PRIDE did not hear anything more from Mr. Andrews until November 15, 2012, when he sent a letter stating he was not resigning from his job, he appreciated the time allotted to him, and he needed more leave to have a new reasonable accommodation questionnaire completed. Walters Decl. Ex. N.

On the morning of November 16, 2012, Mr. Andrews did not show up for work. Walters Decl. ¶ 39. Mr. Andrews arrived instead in the afternoon to hand-deliver a note from Dr. Doan, dated November 16, 2012, requesting additional leave. Andrews Decl. ¶ 30. In his declaration, Mr. Andrews notes Dr. Doan was not available to sign the letter that day, so he first hand-delivered the unsigned note to PRIDE, and then waited until Monday, November 19, to get a copy of the note signed. *Id.* When he arrived at PRIDE on November 16, Mr. Andrews met with Donna Walters, the head of HR, and said he was ready to work that day. *Id.* Ms. Walters told him to wait for a letter PRIDE had been working on, which Mr. Andrews later discovered was a termination letter. *Id.*

On November 19, 2012, the same day PRIDE received the signed medical note from Dr. Doan, Walters Decl. ¶ 40, PRIDE issued a termination letter to Mr. Andrews for "his failure to follow instructions and provide return to work documentation by October 23, 2012, and for his failure to return to work on November 16–19, 2012." Walters Decl. ¶ 42 & Ex. M.

In making the decision to terminate Mr. Andrews, Ms. Walters consulted with PRIDE's HR representative Andre Anthony, the person responsible for corresponding with Mr. Andrews throughout his FMLA leave. Anthony Dep. 107:12–13. Mr. Anthony testified that he told Ms. Walters he did not receive any information from Mr. Andrews by the requested due date of October 23, 2012. *Id.* He also testified he did not know whether Mr. Andrews' doctor had made contact with HR, Anthony Dep. 107:18–21, or whether Mr. Andrews contacted anyone besides himself, *id.* 107:14–17.

### H. Complaints against PRIDE

During his time on FMLA leave, Mr. Andrews filed several claims and com-

plaints against PRIDE. He filed a workers' compensation claim on May 31, 2012, alleging work-related injuries, including "on the job stress." Andrews Decl. Ex. C. He filed a claim with the National Labor Relations Board on June 17, 2012, stating he was disciplined and harassed for his union activity. Andrews Decl. Ex. B. During his deposition, Mr. Andrews testified he engaged in union activity related to interrupted meal and rest breaks, without clarifying what kind of activity. Andrews Dep. 215:9–24. He also filed a complaint with the California Department of Pesticide Regulation on August 23, 2012, for pesticide exposure during his time at PRIDE. Andrews Dep. 169:15–16, 176:22–177:4.

Mr. Andrews also filed two administrative claims with the California Department of Fair Employment and Housing (DFEH). Daniels Decl. ¶ 7, ECF No. 68. In his first complaint, filed June 25, 2012, Mr. Andrews alleged that between July 2011 and May 2012 he was subjected to differential treatment because of his age and race. Daniels Decl. Ex. B. PRIDE responded to the first complaint in a letter to the DFEH, stating Mr. Andrews' claims were "not accurate," and enclosed copies of his write-ups to support its position. Walters Ex. C. Mr. Andrews received two right-to-sue letters for his first DFEH complaint, on April 17 and April 22, 2013. Daniels Decl. Ex. C.

In his second complaint, filed February 4, 2014, Mr. Andrews alleged discrimination, harassment, and retaliation based on Mr. Andrews' membership in a protected class, disability, national origin, and race. Daniels Decl. Ex. D.[1] Although the second DFEH complaint alleged only that the discrimination occurred on or before August 30, 2013, without more, the parties agree Mr. Andrews' claims for disability discrimination under FEHA accrued, at the latest, by November 19, 2012, the date Mr. Andrews' termination became effective. UMF No. 25. Mr. Andrews received a right-to-sue letter for his second DFEH complaint later on February 4, 2014; the same day he had filed the second DFEH complaint. Daniels Decl. Ex. D.

## III. LEGAL STANDARD

A court will grant summary judgment "if…there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Rule 56 also authorizes granting summary judgment on only part of a claim or defense, known as partial summary judgment. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."). The standard that applies to a motion for partial summary

---

1. The court notes Mr. Andrews' deposition testimony raises a doubt whether he filed this complaint with the DFEH or whether his lawyer, Ms. Andrea Rosa, signed and filed the complaint without Mr. Andrews' notice or consent. *See* Andrews Dep. 415:9 (when asked about the second DFEH complaint during his deposition, Mr. Andrews stated he did not recall filing it), 415:19 (Mr. Andrews did not recognize complaint or right to sue letter that followed the complaint), 416:11–13 (when asked how he was discriminated against on August 30, 2013, Mr. Andrews said, "I don't know what they're referring to when they say August 30, 2013."), 416:23–25 (when specifically asked if he was discriminated against on August 30, 2013, Mr. Andrews said, "I know I was fired in November of 2012.").

judgment is the same as that which applies to a motion for summary judgment. *See State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication); *ARC of Cal. v. Douglas*, No. 11–02545, 2015 WL 631426, at *3 (E.D. Cal. Feb. 13, 2015).

The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact...." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record...or show [ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts."). Moreover, "the requirement is that there be no genuine issue of material fact...Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. A district court is "not required to comb the record to find some reason to deny a motion for summary judgment." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## IV. DISCUSSION

### A. Absence of Written Opposition

Defendants PRIDE and Ms. Zurbuchen move for summary judgment on each of Mr. Andrews' claims. At the outset, the court notes Mr. Andrews' opposition does not address several arguments defendants make in support of their motion, including the claims of FEHA hostile work environment, § 1981 race discrimination, retaliation in violation of the FMLA, and termination in violation of the FMLA. *See generally* Opp'n. Mr. Andrews' counsel, Ms. Rosa, stated at hearing that she was not abandoning any claims, but represented she did not respond to some of defendants' arguments because her original opposition was erased electronically within hours before the court's filing deadline. With her original opposition having disappeared, counsel explained she scrambled to assemble a decent, working opposition before the filing deadline and haphazardly neglected to address a number of issues.

Counsel did not alert the court or defendants to this mishap until she was asked about it at the hearing. At that point she asked the court to allow leave to attach a table of contents to her opposition brief. The court denied this request. Counsel did not request leave to clarify or supplement the substance of her filed opposition, so the court takes the opposition as it finds it. Nevertheless, the court takes care to consider the merits of plaintiff's position rather than construing counsel's incomplete briefing as partial consent to granting defendants' motion.

## B. State Law Claims

### 1. Federal Enclave Doctrine

Defendants argue, as they did in their prior motion to dismiss, Mr. Andrews' state law claims are barred because the events in question occurred on a federal enclave. Mot. at 26.

■ The federal enclave doctrine derives from Article I, section 8, clause 17 of the United States Constitution, which provides Congress shall have the power "to exercise [exclusive legislative] Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S.C.A. Const. Art. 1, § 8, cl. 17; see also Pac. Coast Dairy v. Dep't of Agric. of Cal., 318 U.S. 285, 294, 63 S.Ct. 628, 87 L.Ed. 761 (1943) (citing U.S.C.A. Const. Art. 1, § 8, cl. 17) (holding the state of California was not authorized to regulate the sale of milk sold to war department located on federal enclave). This essentially means, when the federal government acquires a tract of land or property, jurisdiction over the land rests primarily, if not exclusively, with the United States, and "local law not inconsistent with federal policy [may] remain[ ] in force until altered by national legislation." Id.

■ Here, in its order on defendants' motion to dismiss, the court concluded the land designated as Travis AFB qualified for federal enclave status. Prev. Order at 7. But because the events in question occurred at David Grant Medical Center, a later-acquired tract either on or near Travis AFB, the court noted it could not say at that point whether defendants' alleged conduct took place on a federal enclave. Id. Although the parties have engaged in full discovery, neither party presented new evidence on this issue, and defendants' mere reiteration of their previously unsupported

argument does not assist the court or make their case.

Defendants' motion for summary judgment on the basis of the federal enclave doctrine is DENIED, and the court proceeds to the merits of Mr. Andrews' state law claims.

### 2. Disability Discrimination

Defendants argue first that they are entitled to summary judgment because Mr. Andrews' disability discrimination claims for failure to accommodate and failure to engage in the interactive process are barred by FEHA's one-year statute of limitations. Mot. at 13. Mr. Andrews argues the statute of limitations was tolled as a result his pending workers' compensation claim, which he argues addressed the same injuries supporting his discrimination claim, namely on-the-job stress. Opp'n at 14.

FEHA prohibits discrimination in employment on the basis of physical or mental disability. Cal. Gov't Code § 12940(a); Jimeno v. Mobil Oil Corp., 66 F.3d 1514, 1520 (9th Cir. 1995) (interpreting FEHA). The Ninth Circuit has held FEHA provisions relating to disability discrimination are based on the ADA, Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1133 n.3 (9th Cir. 2001), and "stress" can be considered a mental impairment under the ADA, see Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1088 (9th Cir. 2001).

■ The statute of limitations for a FEHA action is found in California Government Code section 12960, which provides, "[n]o complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred. . . ." Cucuzza v. City of Santa Clara, 104 Cal. App.4th 1031, 1040, 128 Cal.Rptr.2d 660

(2002). This statute of limitations can be tolled when the plaintiff submits a workers' compensation claim for the same injury that gives rise to the FEHA claim filed with the court. *See Elkins v. Derby*, 12 Cal.3d 410, 413, 115 Cal.Rptr. 641, 525 P.2d 81 (1974).

In *Elkins*, the plaintiff filed a timely claim for benefits with the Workmen's Compensation Appeals Board after he was injured while working on the defendants' premises. *Id.* at 411, 115 Cal.Rptr. 641, 525 P.2d 81. The Board's decision became final after the statute of limitations applicable to plaintiff's injury ran and the plaintiff then filed a personal injury tort suit for the same injury that had given rise to his workers' compensation claim. *Id.* The California Supreme Court held that the limitations period for the plaintiff's personal injury claim was tolled from the day he filed with the Board to the day the Board's decision became final, noting allowing the newly filed civil complaint to proceed would not frustrate the statute of limitations' primary purpose; to prevent surprise to the defendants. *Id.* at 413 n.1, 416, 115 Cal.Rptr. 641, 525 P.2d 81. The state Supreme Court thus reversed the superior court's holding that plaintiff's personal injury claim was time-barred. *Id.* at 420, 115 Cal.Rptr. 641, 525 P.2d 81.

A California Court of Appeals has since construed the equitable tolling doctrine of *Elkins* narrowly, holding the statute of limitations for a personal injury claim is not tolled when a plaintiff pursues a remedy for a wrong related to, but not the same as, the injury underlying a workers' compensation claim. *Aerojet Gen. Corp. v. Superior Court*, 177 Cal.App.3d 950, 955, 223 Cal.Rptr. 249 (1986). In *Aerojet*, the plaintiff sued his employer for fraudulent concealment of the cause of his injuries, bringing suit after he filed a workers' compensation claim for the injury itself. *Id.*

The court held the equitable tolling doctrine did not apply to the plaintiff's fraudulent concealment claim, distinguishing the case from that of *Elkins*. *Id.* at 954–55, 223 Cal.Rptr. 249. The court held the plaintiff in *Aerojet* sought to challenge a wrong "entirely [different]" from the injury alleged in his workers' compensation claim, thereby stifling defendants' ability to gather evidence necessary to refute the later filed civil claim. *Id.* at 955–56, 223 Cal. Rptr. 249. The plaintiff's claim was dismissed as time-barred. *Id.* at 957, 223 Cal. Rptr. 249. The Ninth Circuit cited to *Aerojet* as an example of California's longstanding refusal to apply the "equitable tolling doctrine to toll the statute of limitations on a claim for a distinct wrong that was not the basis of the earlier proceeding." *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131, 1141 (9th Cir. 2001). In the end, the Ninth Circuit's conclusion in *Daviton* aligned with *Aerojet*, because it held "the equitable tolling doctrine requires that the same wrong serve as the predicate for the earlier and later proceedings to make sure defendant received proper notice." *Id.*

Here, there is no dispute the last day Mr. Andrews' claims for disability discrimination could accrue was November 19, 2012, the date his termination became effective. UMF No. 25. Further, it is undisputed that Mr. Andrews filed his disability discrimination claim with the DFEH on February 4, 2014, well more than one year after this accrual date and nineteen months after he filed his racial and age discrimination claims in his first complaint made to DFEH. Daniels Decl. Exs. B, D. In short, Mr. Andrews' disability discrimination claims are untimely unless the limitations period is tolled for approximately fourteen months, the difference in time between November 19, 2012, the last accrual date, and February 4, 2014, the date

he filed his DFEH complaint for disability discrimination.

 In the operative complaint, Mr. Andrews alleges PRIDE's failure to accommodate his mental disability and failure to engage in the interactive process serve as the basis of his FEHA disability discrimination claims. *See* SAC ¶¶ 91–108. Whereas in his workers' compensation claim Mr. Andrews alleged "on the job stress," nowhere in the instant complaint does Mr. Andrews assert a claim based on this injury alone, including, including by saying defendants discriminated against him because of his stress. *Compare id. with* Andrews Decl. Ex. C. In his opposition, Mr. Andrews argues only that "defendant[s] had notice of [the claimed] disability, and [ ] therefore, cannot demonstrate any prejudice" Opp'n at 15. But because Mr. Andrews does not seek to recover in this civil action for the injury at the heart of his workers' compensation claim, as the plaintiff did in *Elkins*, 12 Cal.3d at 413, 115 Cal.Rptr. 641, 525 P.2d 81, but rather for a "different wrong entirely," as in *Aerojet*, 177 Cal.App.3d at 955–56, 223 Cal.Rptr. 249, his argument is unavailing. Construing the facts in favor of plaintiff, it is not reasonable to conclude a workers' compensation claim for "on the job stress" would have alerted PRIDE to the possibility of disability discrimination claims for failure to accommodate and failure to engage in the interactive process. The time for filing of Mr. Andrews' disability discrimination claims was not equitably tolled, and Mr. Andrews' claims for disability discrimination due to failure to accommodate and discrimination for failure to engage in the interactive process are therefore dismissed as time-barred.

Defendants' motion for summary judgment on this claim is GRANTED.

### 3. Race Discrimination

Defendants contend they are entitled to summary judgment on Mr. Andrews' FEHA race discrimination claim, saying, in essence, a jury could not conclude he was terminated under circumstances suggesting a racially discriminatory motive. Mot. at 17.

#### a) Legal Standard

 FEHA makes it "unlawful for an employer to discharge a person on the basis of race, or otherwise to discriminate against the person in compensation or in terms, conditions or privileges of employment." *Mixon v. Fair Emp't and Hous. Comm'n*, 192 Cal.App.3d 1306, 1316, 237 Cal.Rptr. 884 (1987). Where "discharge from employment is the challenged action, the complainant must make an initial showing that plaintiff was discharged from a position for which he was qualified 'under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* at 1318, 237 Cal.Rptr. 884 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Although the claimant "need not prove that racial animus was the sole motivation behind the challenged action," he must nonetheless prove by a preponderance of the evidence that "there was a causal connection between the employee's protected status and the adverse employment decision." *Id.* at 1319, 237 Cal.Rptr. 884.

 To determine whether discriminatory discharge occurred, the court engages in a three-part analysis. First, to create a rebuttable presumption that the employer unlawfully discriminated against the employee, a plaintiff must show (1) he belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the protected class were retained in similar jobs. *Id.* at 1318, 237 Cal.Rptr. 884. Second, the

burden shifts to the defendant employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If the defendant employer carries its burden, the court proceeds to the third step, where the plaintiff must demonstrate pretext, that the defendant's "proffered reason was not the true reason for the employment decision." *Id.* The plaintiff can carry this burden either "directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 1318–19, 237 Cal.Rptr. 884.

b) Plaintiff's Prima Facie Case

■ Here, as an African-American, Mr. Andrews belongs to a protected class for the purposes of FEHA. *See McKinney v. Am. Airlines, Inc.*, 641 F.Supp.2d 962, 972 (C.D. Cal. 2009) (interpreting FEHA). And it is undisputed he ultimately was terminated. This leaves the second and fourth prongs of the prima facie case analysis.

As to the second, Mr. Andrews' job performance, the evidence includes the performance reviews PRIDE gave Mr. Andrews in July 2010 and June 2011, which included several ratings of "meets expectations," one of which noted Mr. Andrews was a "positive lead." Walters Decl. Ex. C at 37–38. While the reviews also noted room for improvement, they did not characterize his work as unsatisfactory. *Id.* From this, a reasonable juror could find Mr. Andrews' work was satisfactory prior to his termination.

Regarding the fourth prong, additional evidence in the record could convince a reasonable juror to conclude others not in the protected class received more favorable treatment than plaintiff, or were retained in similar jobs despite shortcomings. *See Mixon*, 192 Cal.App.3d at 1318, 237 Cal.Rptr. 884. During his deposition, Mr. Andrews testified his Caucasian co-workers were not terminated or reprimanded for serious misconduct, whereas he was continually reprimanded for less severe conduct. Andrews Dep. 443:2–14. For example, PRIDE reprimanded Mr. Andrews for coming to work fifteen minutes late and unnecessarily spraying an area for weeds after being instructed not to do so. Walters Decl. Ex. C. But Mr. Andrews testified that when a Caucasian co-worker ruptured the main water line to an important building, PRIDE supervisors said that it was "cute [that the co-worker] hit that pipe." Andrews Dep. 443:2–14. Defendants do not dispute PRIDE managers characterized the Caucasian co-worker's conduct as "cute." Similarly, a reasonable jury might well believe Mr. Andrews was treated differently than another Caucasian co-worker who became insubordinate with a PRIDE union representative but did not receive a write-up or any form of disciplinary action. Andrews Dep. 447:24–448:15.

Mr. Andrews also presents evidence showing his supervisor, Ms. Zurbuchen, subjected him to at least two instances of treatment that could be found discriminatory. In one instance, she pointed to photos of other minorities PRIDE recently fired, while exclaiming Mr. Andrews could find himself in that group one day. Andrews Dep. 49:22–50:4. Mr. Andrews has submitted evidence that on another occasion Ms. Zurbuchen used the loaded word "nigger" in Mr. Andrews' presence. *Id.* 427:1-25. While it is not disputed that Ms. Zurbuchen used the word in the context of asking whether Mr. Andrews himself used that word at work, *id.* 49:8–10, a reasonable juror could conclude the mere utterance of this particular word by a su-

pervisor, instead of referring to the racial epithet as "the n-word," could be "highly offensive and demeaning" to an African-American subordinate. As the Ninth Circuit has observed, "no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004). Whether this instance reflects racial insensitivity, thus making it more likely Mr. Andrews was terminated under conditions suggesting discrimination, is a question best left for a jury to decide.

Although there is no direct evidence of Ms. Zurbuchen's making the ultimate decision to fire Mr. Andrews, there is sufficient circumstantial evidence to raise a genuine issue of material fact regarding Ms. Zurbuchen's role in or influence on the PRIDE termination decision. As the manager of Grounds Maintenance at PRIDE, Ms. Zurbuchen was involved in deciding where to assign Grounds Maintenance Leads such as Mr. Andrews, and was at least partly responsible for reassigning Mr. Andrews to a lower-level detail position in which he would lead fewer employees and be subject to route changes each day. Andrew Decl. ¶ 17. Ms. Zurbuchen signed all of Mr. Andrews' disciplinary write-ups, except one time when she was on vacation. *Id.* Ex. C at 25–37. All things considered, a reasonable jury could conclude discriminatory animus infected the decision to terminate Mr. Andrews. *See Metoyer v. Chassman*, 504 F.3d 919, 938 (9th Cir. 2007) (plaintiff showed discriminatory animus in employment decision based on circumstantial evidence of discriminatory animus of plaintiff's supervisor).

Viewing the evidence in the light most favorable to plaintiff, a reasonable juror could conclude Mr. Andrews has established his prima facie case of racial discrimination. The burden thus shifts to defendants "to articulate some legitimate, nondiscriminatory reason" for Mr. Andrews' termination. *Mixon*, 192 Cal.App.3d at 1318, 237 Cal.Rptr. 884.

c) Defendant's Nondiscriminatory Reasons

■ Defendants contend Mr. Andrews was terminated because of his failure to follow instructions to communicate with HR representative Andre Anthony by October 23, 2012, as well as his failure to return to work at the expiration of his extended leave of absence. Mot. at 18. Defendants also contend their ultimate termination decision relied on the repeated disciplinary write-ups Mr. Andrews received throughout his employment. *Id.* In a letter sent to the DFEH in response to Mr. Andrews' FEHA race discrimination claim, PRIDE argued Mr. Andrews' race discrimination claim was "not accurate," and enclosed copies of the write-ups to support its position. Walters Ex. C at 21–37.

Defendants have articulated reasons a reasonable jury could find the decision to terminate Mr. Andrews was legitimate and nondiscriminatory. *See Mixon*, 192 Cal. App.3d at 1306, 237 Cal.Rptr. 884 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."). The court proceeds to the third step of analysis, pretext.

d) Pretext

■ At the third step, a reasonable jury could conclude defendants' "proffered reason[s] w[ere] not the true reason[s] for the employment decision." *Id.* at 1318, 237

Cal.Rptr. 884. As to PRIDE's first reason for termination, regarding Mr. Andrews' failure to communicate with HR representative Andre Anthony by October 23, 2012, as well as his failure to return to work, Mr. Andrews' doctor communicated with PRIDE by October 22 in a letter requesting additional leave to give Mr. Andrews time to adjust his medications. Walters Decl. ¶ 36 & Ex. L. Mr. Andrews testified he did show up to work on November 16, the day his extended leave expired, albeit in the afternoon to hand-deliver a note from his doctor requesting still further leave. Andrews Decl. ¶ 30. Mr. Andrews also notes he told PRIDE he was ready to start working that day, but Donna Walters in HR told him to wait for a letter PRIDE had been working on, which Mr. Andrews later discovered was the termination letter. *Id.*

On balance, the state of the record is insufficient for the court to conclude defendants can prevail as a matter of law; rather a reasonable jury could conclude PRIDE's proffered reason is "unworthy of credence." *Mixon*, 192 Cal.App.3d at 1318–1319, 237 Cal.Rptr. 884. As to PRIDE's reliance on the disciplinary write-ups, defendants' argument is belied by the performance reviews PRIDE gave Mr. Andrews in the same timeframe of July 2010 and June 2011, which included several ratings of "meets expectations," and noted Mr. Andrews was a "positive lead," and did not affect his work assignment in any way. Walters Decl. Ex. C at 37–38. Moreover, Mr. Andrews' last disciplinary write-up occurred in February 2012, more than eight months before he was terminated, and aside from the short-term reassignment, Mr. Andrews was never demoted or at actual risk of termination. *Id.* Defendants' argument is further belied by the termination letter PRIDE sent to Mr. Andrews, which did not attribute his termination to his disciplinary write-ups, but only to his

delays in contacting HR representative Andre Anthony regarding his return date. Walters Decl. Ex. M.

Mr. Andrews may be able to establish pretext, if the jury reaches the question. Summary judgment is DENIED on the race discrimination claim.

### 4. Hostile Work Environment

 Harassment in the form of a hostile work environment constitutes unlawful discrimination in violation of FEHA. *Lyle v. Warner Bros. Television Prod.*, 38 Cal.4th 264, 279, 42 Cal.Rptr.3d 2, 132 P.3d 211 (2006). Although commonly alleged in connection with sex and gender, a hostile work environment claim also may be based on other protected characteristics, including race. *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003).

Because California courts look to Title VII cases to guide their interpretation of FEHA, this court looks to *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002) to determine what showing is required in a hostile environment claim. *See Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (Title VII and FEHA operate under the same guiding principles). The *Rene* court held a plaintiff must show the following to prevail on a hostile work environment claim: (1) she was subjected to verbal or physical conduct, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *Id.* The only question here is whether Mr. Andrews has satisfied the third element. *See* Mot. at 24.

 While a "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" will not, by itself, establish a case, a plaintiff can overcome a motion for summary judgment

when the employer has "created a working environment heavily charged with ethnic or racial insult and ridicule." *Etter v. Veriflo Corp.*, 67 Cal.App.4th 457, 463, 79 Cal. Rptr.2d 33 (1998). The plaintiff need not show explicitly racialized conduct, for calling someone names of a different sort can serve as a proxy for race and ethnicity. *El–Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005) (interpreting § 1981 and Title VII). In *El–Hakem*, for example, the Ninth Circuit held triable issues of fact precluded summary judgment when the plaintiff's employer repeatedly insisted on calling the plaintiff "Manny" instead of by his Arabic name, despite the plaintiff's strenuous objections. *Id.* at 1071. Physical conduct also can support a hostile environment claim. In *Manatt v. Bank of America*, for example, the Ninth Circuit held the plaintiff was subject to a hostile environment where her co-workers ridiculed her not only for mispronouncing "Lima," but also pulled their eyes back in mocking imitation of her appearance and Asian heritage. 339 F.3d 792, 794–95, 798 (9th Cir. 2003) (interpreting § 1981 and Title VII).

██ Here, defendants argue Mr. Andrews was not subject to conditions "so severe or pervasive" as to alter his work environment. Mot. at 24. Mr. Andrews, in opposition, points to evidence suggesting he witnessed and was himself subject to treatment that referenced race or national origin, which included Ms. Zurbuchen's prohibition on speaking Spanish in which he was fluent, calling plaintiff "slow," threatening him with termination similar to another group of minorities that had been fired, and referring to his co-workers as the "Mexican Mafia." Rosa Decl. ¶ 18; Andrews Dep. 49:5–8, 50:10–13. Mr. Andrews also points to the evidence reviewed above suggesting he was treated differently from Caucasian co-workers whose job performance was problematic.

On the record before the court no reasonable juror could conclude Mr. Andrews was subjected to racial discrimination when being called "slow," without more. Mr. Andrews does not argue Ms. Zurbuchen referred to him as slow because of his race, and no precedent or sister court suggests the word "slow" is a proxy for race.

On whether the prohibition on Mr. Andrew's ability to speak Spanish can support a hostile environment claim, the Ninth Circuit has addressed bilingualism in the context of a Title VII hostile environment claim. *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir. 1993). The Ninth Circuit has observed that prohibitions on employees who speak both Spanish and English are not so adverse as to amount to a hostile environment claim when bilingual speakers wish to speak one language, such as Spanish, as a matter of "individual preference" rather than necessity, as Title VII "does not protect the ability of workers to express their cultural heritage at the workplace." *Id.* at 1486–87.

But the facts of *Garcia* are distinguishable from those here, for a reasonable juror could find Mr. Andrews' decision to speak with monolingual members of his service crews was made out of "necessity" rather than "individual preference," *id.*, because evidence of record suggests other employees, including PRIDE managers and supervisors, could not effectively communicate the tasks of the job to these crew members. Andrews Decl. ¶ 6. Under these circumstances, a reasonable juror could find the prohibition on speaking Spanish in this case not only interfered with Mr. Andrews' practical necessity to communicate, but also amounted to racial discrimination against Mr. Andrews' monolingual Spanish speaking co-workers, which itself in turn interfered with Mr. Andrews' "personal right to work in an environment unaffected by racial discrimination." *Cf. id.* at 1488

(monolingual Spanish-speaking plaintiff could sustain Title VII discrimination claim if she cannot enjoy the privilege of conversing on the job if conversation is limited to a language she cannot speak); *see also Smithberg v. Merico, Inc.,* 575 F.Supp. 80, 83 (C.D. Cal. 1983) (White plaintiff could assert discrimination claim against employer based on alleged practice of discrimination against African Americans; citing *United States E.E.O.C. v. T.I.M.E.–D.C. Freight, Inc.,* 659 F.2d 690, 691–92 (5th Cir. 1981)). Similarly, Mr. Andrews could sustain a hostile environment claim based on Ms. Zurbuchen's repeated references to Mr. Andrews' co-workers as the "Mexican Mafia," for a juror could reasonably conclude this conduct also interfered with Mr. Andrews' "personal right to work in an environment unaffected by racial discrimination." *Smithberg,* 575 F.Supp. at 83.

On balance, the prohibition on Mr. Andrews' ability to speak Spanish and Ms. Zurbuchen's repeated references to Mr. Andrews' co-workers as the "Mexican Mafia," when combined with the threat of termination linked to previously terminated minority workers, could support a hostile environment claim. When considering the duration of the alleged discriminatory conduct, Mr. Andrews testified he witnessed and was subject to this differential treatment from February 2012 until the time he went on FMLA leave in May 2012. Walters Decl. ¶¶ 28-29; Andrews Dep. 227:14–228:18. A reasonable jury might conclude Mr. Andrews was subjected to repeated incidents of harassment based on race, whether directly or indirectly. *El–Hakem* 415 F.3d at 1073; *see also Smithberg,* 575 F.Supp. at 83.

Defendants' motion for summary judgment in this respect is DENIED.

### 5. Failure to Prevent Race Discrimination

It also is an unlawful employment practice under FEHA "for an employer...to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring" in the workplace. Cal. Gov't Code § 12940(k). When a plaintiff seeks to recover damages based on a claim of failure to prevent discrimination or harassment, he must show three essential elements: (1) plaintiff was subjected to discrimination, harassment or retaliation; (2) defendant failed to take all reasonable steps to prevent discrimination, harassment or retaliation; and (3) this failure caused the plaintiff to suffer injury, damage, loss or harm. *Achal v. Gate Gourmet, Inc.,* 114 F.Supp.3d 781, 804 (N.D. Cal. 2015) (interpreting FEHA). Some examples of "reasonable steps" available to remedy harassment or discrimination under FEHA include "affirmatively raising the subject of harassment [or discrimination], expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment [or discrimination] under California law, and developing methods to sensitize all concerned." *Id.* Other reasonable steps include the establishment and promulgation of antidiscrimination policies and the implementation of effective procedures to handle discrimination-related complaints and grievances. *Cal. Fair Emp't & Hous. Comm'n v. Gemini Aluminum Corp.,* 122 Cal.App.4th 1004, 1025, 18 Cal.Rptr.3d 906 (2004). The causation element requires an employee to show the discriminatory conduct was a "substantial factor" in causing his harm. *Alamo v. Practice Mgmt. Info. Corp.,* 219 Cal.App.4th 466, 480, 161 Cal. Rptr.3d 758 (2013). Termination from employment is an injury sufficient to support recovery under a failure to prevent discrimination claim. *See Gemini Aluminum*

Corp., 122 Cal.App.4th at 1021, 18 Cal. Rptr.3d 906.

Here, defendants argue Mr. Andrews' failure to prevent discrimination claim fails because Mr. Andrews has not shown he suffered racial discrimination as a matter of law. Mot. at 21–22. But as noted above, the court has denied summary judgment to defendants on Mr. Andrews' race discrimination claim. Here as well, defendants have not borne their burden and their motion is DENIED.

### 6. Wrongful Termination in Violation of Public Policy

As a matter of California common law, "when an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." *Tameny v. Atl. Richfield Co.*, 27 Cal.3d 167, 170, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980); *see also Freund v. Nycomed Amersham*, 347 F.3d 752, 758 (9th Cir. 2003). The public policy implicated must be "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of discharge; and (4) substantial and fundamental." *Freund*, 347 F.3d at 758 (quoting *City of Moorpark v. Superior Court*, 18 Cal.4th 1143, 1159, 77 Cal.Rptr.2d 445, 959 P.2d 752 (1998)).

The public policy implicated by Mr. Andrews' claim here is that articulated in Labor Code section 1102.5, which prohibits employers from retaliating against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe the information discloses a violation of state or federal statute. Cal. Lab. Code § 1102.5(b); *Cramer v. Consol.*

*Freightways, Inc.*, 209 F.3d 1122, 1134 n.12 (9th Cir. 2000) (analyzing section 1102.5). The purpose of section 1102.5 is to "encourage workplace whistleblowers to report unlawful acts without fearing retaliation." *Hollie v. Concentra Health Servs., Inc.*, No. 10–5197, 2012 WL 993522, at *5 (N.D. Cal. Mar. 23, 2012) (citing *Green v. Ralee Eng'g Co.*, 19 Cal.4th 66, 77, 78 Cal.Rptr.2d 16, 960 P.2d 1046 (1998)).

Here, a reasonable juror could conclude one or more of Mr. Andrews' complaints to the National Labor Relations Board on June 17, 2012, Andrews Decl. Ex. B, the California Department of Pesticide Regulation on August 23, 2012, Andrews Dep. 169:15–16, 176:22–177:4, and the DFEH on June 25, 2012, Daniels Decl. Ex. B, amount to disclosure of a violation of a state or federal statute. Cal. Lab. Code § 1102.5(b); *Cramer*, 209 F.3d at 1122.

Defendants argue Mr. Andrews' claim for wrongful termination in violation of public policy fails as "entirely derivative" of his FEHA claims. Mot. at 22. As noted, the court has denied summary judgment on Mr. Andrews' racial discrimination claim. Defendants have not borne their burden, and their motion is DENIED.

### 7. Summary

In sum, defendants' motion is DENIED on Mr. Andrews' state claims of racial discrimination, hostile work environment, failure to prevent discrimination, and wrongful termination in violation of public policy. Defendants' motion is GRANTED on Mr. Andrews' state disability discrimination claims for failure to accommodate and failure to engage in the interactive process. The court now proceeds to the merits of Mr. Andrews' federal claims.

## C. Federal Claims

### 1. Race Discrimination in Violation of § 1981

In analyzing Mr. Andrews' race discrimination claim under § 1981, the court applies the same legal principles as in a Title VII disparate treatment case, akin to the burden-shifting framework governing FEHA race discrimination claims. *See, e.g., Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 849–50 (9th Cir. 2004). Once the plaintiff establishes a prima facie case of discrimination, defendant must then articulate a legitimate, nondiscriminatory reason for its conduct; if defendant surpasses this hurdle, plaintiff then may defeat summary judgment by showing defendant's reasons are pretextual. *Id.*

■ Here, as noted in the FEHA race discrimination analysis above, a reasonable jury could conclude Mr. Andrews has established a prima facie case, defendants point to a "legitimate, nondiscriminatory reason," but Mr. Andrews has undermined the veracity of that reason. Accordingly, the evidence in the record may convince a reasonable juror that a discriminatory reason more likely than not motivated PRIDE as the employer in the termination decision.

Defendants' motion on this claim is DENIED..

### 2. Retaliation in Violation of §˙1981

Defendants argue Mr. Andrews has not established a causal link between his protected activity and his termination. Mot. at 21–22. Mr. Andrews contends the causal link between his protected activity and his termination may be established by "the temporal sequence between the protected expression and the adverse action." Opp'n at 13.

As with plaintiff's § 1981and FEHA race discrimination claims, the court applies a burden-shifting framework, where the plaintiff must first establish a prima facie case of retaliation, the defendant must then articulate legitimate, nondiscriminatory reasons for its allegedly retaliatory conduct, and the plaintiff must then show pretext. *Fonseca*, 374 F.3d at 849–50.

■ To make out a prima facie case of retaliation under § 1981, a plaintiff must establish he undertook protected activity, his employer subjected him to an adverse employment action, and there is a causal link between those two events. *Vasquez*, 349 F.3d at 646. To engage in protected activity, the plaintiff must oppose an unlawful employment practice under § 1981. *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) ("[T]he opposed conduct must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation."). An adverse employment action is one that is "reasonably likely to deter employees from engaging in protected activity." *Vasquez*, 349 F.3d at 646. Where the plaintiff seeks to establish causation solely with evidence of close proximity, the adverse action must follow within a relatively short time after the protected activity. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.").

ˌ■ Mr. Andrews contends he engaged in protected activity when he first took FMLA leave on May 7, 2012, Andrews Dep. 227:14–228:18, filed a workers' compensation claim on May 31, 2012, Andrews Decl. Ex. C, filed a complaint with the California Department of Pesticide

Regulation on August 23, 2012, Andrews Dep. 169:15–16, filed a claim with the NLRB on June 17, 2012, Andrews Decl. Ex. B, and filed FEHA complaints with the DFEH on June 25, 2012 and February 4, 2014, Daniels Decl. ¶ 7.

Assuming these actions constitute "protected activity," and that the February 2014 filing counts in the analysis, the smallest temporal gap between Mr. Andrews' last protected activity in February 2014 and his termination is 148 days, or approximately five months. The record includes no other evidence reasonably supporting a connection between Mr. Andrews' protected activity and his termination. Five months is not sufficient to show adverse action followed "within a relatively short time." *See Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 615, 262 Cal.Rptr. 842 (1989); *Jadwin v. Cty. of Kern*, 610 F.Supp.2d 1129, 1156 (E.D. Cal. 2009) (five to six month gap in context of a section 1102.5 claim insufficient); *see also Breeden*, 532 U.S. at 273–74, 121 S.Ct. 1508 (20-month period in Title VII case insufficient); *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034 (9th Cir. 2006) (8-month period in Title VII case insufficient); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period in FMLA case insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–1175 (7th Cir. 1992) (4-month period in Title VII retaliation case insufficient).

Mr. Andrews has not established there is a triable fact as to his § 1981 retaliation claim, and defendants' motion for summary judgment on this claim is GRANTED.

### 3. Interference with Exercise of FMLA Rights

Defendants contend Mr. Andrews' FMLA claims alleging retaliation and dis-criminatory termination fail as a matter of law. Mot. at 25.

#### a) Anti-Termination and Anti-Retaliation Claims

 Mr. Andrews alleges he was retaliated against and terminated in violation of the FMLA. SAC ¶¶ 139–159. "In the Ninth Circuit, the anti-retaliation or anti-discrimination provisions do not cover visiting negative consequences on an employee simply because he has used FMLA leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). Instead, the anti-termination and retaliation provisions apply to discrimination and retaliation against an employee after that employee has opposed an employer's violation of the FMLA. *Id.* Accordingly, where plaintiff alleges defendants terminated him based on the exercise of FMLA rights, he has an interference claim under the FMLA. *Id.* Here, Mr. Andrews alleges only that defendants retaliated against and terminated him because he exercised his right to take FMLA leave, SAC ¶ 152, so the court construes his allegations as a single interference claim under the FMLA, *Bachelder*, 259 F.3d at 1124.

#### b) Interference Claim

 The FMLA prevents an employer from interfering with the employee's right to take leave by refusing to authorize leave, discouraging the use of leave, or considering leave as a negative factor in an employment action. *Liu v. Amway Corp.*, 347 F.3d 1125, 1132–33 (9th Cir. 2003). To prevail on an interference claim, the plaintiff must prove by a preponderance of the evidence that the taking of FMLA-protected leave constituted a negative factor in the decision to terminate him. *Bachelder*, 259 F.3d at 1125. The plaintiff can prove this claim by using either direct or circumstantial evidence, or both. *Id.*

Here, there is evidence bearing on the employer's motives: PRIDE told Mr. Andrews when it fired him that it based its decision on his inability to follow the directions of the October 2, 2012 letter requiring that Mr. Andrews contact Andre Anthony by October 23, 2012 regarding his return to work. Walters Decl. Ex. M. Additionally, PRIDE contends it terminated Mr. Andrews because of his disciplinary write-ups. *Id.* Ex. C. Mr. Andrews does not point to any evidence suggesting his FMLA absence was considered a "negative factor" in the firing decision. Further, after an independent review of the record, the court finds no evidence suggesting the FMLA absence was considered a negative factor, or that PRIDE's reason for terminating Mr. Andrews was mere pretext to camouflage any interference with Mr. Andrews' FMLA rights. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (the court is not required to "comb the record" to find some reason to deny summary judgment). Construing the evidence in a light most favorable to Mr. Andrews, no reasonable juror could conclude Mr. Andrews was terminated on account of his FMLA leave. If anything, PRIDE allowed a lengthy leave without expressing concern about the reason for the leave or its length. Defendants' motion on this claim is GRANTED.

### 4. Summary

In sum, defendants' motion for summary judgment as to federal claims is DENIED on Mr. Andrews' § 1981 race discrimination claim, GRANTED on his § 1981 retaliation claim, and GRANTED on his FMLA retaliation and discrimination claims construed as an interference claim.

## V. CONCLUSION

For the foregoing reasons, the court DENIES defendants' motion for summary

judgment on the following claims: (1) FEHA race discrimination, (2) FEHA hostile environment, (3) FEHA failure to prevent discrimination, (4) wrongful termination in violation of public policy and (5) § 1981 race discrimination. The court GRANTS defendants' motion for summary judgment on the following claims: (1) disability discrimination in the form of failure to accommodate, (2) disability discrimination in the form of failure to engage in interactive process, (3) § 1981 retaliation, and (4) interference with FMLA rights.

This order resolves ECF No. 65.

IT IS SO ORDERED.